PEOPLE v YOUNG (AFTER REMAND)

Docket No. 67373. Argued June 4, 1985 (Calendar No. 8). Decided
    August 5, 1986.

Jeffrey A. Young was convicted by a jury in the Alpena Circuit
    Court, Philip J. Glennie, J., of first-degree felony murder. The
    Court of Appeals, M. F. CAVANAGH, P.J., and D. E. HOLBROOK,
    JR., and PIERCEY, JJ., affirmed (Docket No. 44489). The Su-
    preme Court, retaining jurisdiction, remanded the case to the
    trial court for an evidentiary hearing to determine whether
    serological electrophoresis, a blood-analysis technique that had
    been used to infer the defendant's guilt, has achieved general
    scientific acceptance for reliability among impartial and disin-
    terested experts in the scientific community. 418 Mich 1 (1983).

After remand, in an opinion by Justice LEVIN, joined by Chief
    Justice WILLIAMS and Justice BRICKLEY, the Supreme Court
    held:

General scientific acceptance of the reliability of serological
    electrophoresis of evidentiary bloodstains among impartial and
    disinterested experts in the scientific community has not been
    established. Admission of electrophoresis evidence was error
    which was not clearly harmless, requiring remand for a new
    trial on the charge of second-degree murder.

1. In order to be admitted as evidence, the results of blood
    analyses using the technique of serological electrophoresis must
    be shown to enjoy general acceptance for reliability among
    impartial and disinterested experts in the scientific community.
    The prosecution, in this case, failed to fulfill its burden of
    establishing such acceptance. Evidence presented revealed dis-
    agreement within the scientific community with regard to the
    method of analysis used and the effects of contaminants at a
    crime scene on blood samples. The disagreement is unlikely to
    be resolved until independent validation studies of the thin-gel
    multisystem analysis are undertaken, comprehensive control
    tests evaluating the effects of different contaminants are run,

REFERENCES

Am Jur 2d, Evidence §§ 104, 370, 1104, 1147.
Admissibility, weight, and sufficiency of blood-grouping tests in
    criminal cases. 2 ALR4th 500.

and the results have been subjected to the scrutiny of the scientific community. Thus, results of the electrophoresis should not have been admitted.

2. The error in admitting the results of the blood analyses in this case was not clearly harmless. Test results were inconclusive or inconsistent, and the testimony of the experts differed widely. The remaining evidence was of a nature that but for the evidence resulting from the serological electrophoresis, the jury might have had a reasonable doubt.

Reversed and remanded.

Justice BOYLE, joined by Justice RILEY, dissenting, stated that the record establishes that both the theory of serological electrophoresis and its application to evidentiary dried bloodstains have gained general scientific acceptance in the particular field in which each belongs. Thus, the testimony at issue was properly admitted.

The reliability of novel scientific evidence need not be established by disinterested scientists, those whose livelihood is not intimately connected with a new technique. Such a rule would erect insurmountable obstacles to forensic evidence and needlessly impede admission of probative evidence, excluding the testimony of persons who have the most knowledge in the field. Where witnesses indisputably have education, formal training, and background in a scientific discipline, their testimony should not be disqualified on the ground of self-interest. Rather, the trial court should weigh a witness' credentials and self-interest in determining the reliability of the witness' testimony.

Justices CAVANAGH and ARCHER took no part in the decision of this case.

## OPINION OF THE COURT

1. CRIMINAL LAW — SCIENTIFIC EVIDENCE — SEROLOGICAL ELECTROPHORESIS.

Evidence of the results of serological electrophoretic analysis of bloodstains found at a crime scene was not admissible in a prosecution of first-degree felony murder because it was not shown that the technique has achieved general scientific acceptance for reliability among impartial and disinterested experts in the scientific community.

## DISSENTING OPINION BY BOYLE, J.

2. CRIMINAL LAW — SCIENTIFIC EVIDENCE — SEROLOGICAL ELECTROPHORESIS.

*Both the theory of serological electrophoresis and its application*

to evidentiary dried bloodstains have gained general scientific
acceptance as a reliable identification technique.

3. Criminal Law — Scientific Evidence — Expert Testimony —
Reliability.

The reliability of novel scientific evidence need not be established
by disinterested scientists, those whose livelihood is not inti-
mately connected with a new technique, and where witnesses
indisputably have education, formal training, and background
in a scientific discipline, their testimony should not be disquali-
fied on the ground of self-interest; rather, the trial court should
weigh a witness' credentials and self-interest in determining
the reliability of the witness' testimony.

*Frank J. Kelley*, Attorney General, *Louis J.
Caruso*, Solicitor General, *David M. Funk, Jr.*,
Prosecuting Attorney, and *Leonard J. Malinowski*,
Assistant Attorney General, for the people.

State Appellate Defender (by *Ronald J. Bretz*)
for the defendant.

AFTER REMAND

Levin, J. The question presented, in the words
of the opinion of the Court on an earlier submis-
sion of this appeal, is whether "the results of
serological electrophoresis [of dried evidentiary
bloodstains] have achieved general scientific accep-
tance for reliability among impartial and disinter-
ested experts" in the scientific community.[1] We
conclude that the people have not established such
general scientific acceptance.

I

Defendant Jeffrey Allen Young was convicted of
first-degree murder on evidence that the homicide
was committed during the perpetration of a felony.
The Court of Appeals affirmed.

[1] *People v Young*, 418 Mich 1, 25; 340 NW2d 805 (1983).

The felony described in the information was burglary. On the earlier submission of Young's appeal to this Court, we held that at the time of the homicide[2] the term burglary in the section of the Penal Code defining the offense of first-degree murder meant "breaking and entering of a dwelling house in the nighttime with an intent to commit a felony."[3] The people's evidence tended to show that the breaking and entering occurred in the daytime.[4]

We further held that "the results of the blood analyses were [not] admissible at trial without a prior showing that the technique of serological electrophoresis enjoys general scientific acceptance among impartial and disinterested experts . . . ."[5]

We declined to respond to the question "whether the results of blood analyses are admissible to *include* an accused within the class of possible perpetrators" (emphasis in original) until "development of a record by the trial court at the hearing which we order to determine if serological electrophoretic analysis has achieved general scientific acceptance for reliability, *Frye v United States,* 54 US App DC 46; 293 F 1013 (1923); *People v Davis,* 343 Mich 348; 72 NW2d 269 (1955), by disinterested and impartial experts, *People v Barbara,* 400 Mich 352; 255 NW2d 171 (1977); *People v Tobey,* 401 Mich 141; 257 NW2d 537 (1977)."[6]

We declined to reduce the conviction to second-degree murder "pending resolution of the remain-

[2] In 1980, the statute was amended to substitute "breaking and entering of a dwelling" for "burglary." 1980 PA 28, amending MCL 750.316; MSA 28.548.

[3] *People v Young,* n 1 *supra* at 16.

[4] The "decedent was seen alive at 8:00 A.M.," 3½ hours before his body was discovered. *People v Young,* n 1 *supra* at 4.

[5] *People v Young,* n 1 *supra* at 5.

[6] *People v Young,* n 1 *supra* at 5.

ing issues in this case following remand,"[7] and deferred as "premature" in "light of the hearing which we order" consideration of the prosecutor's argument that "a *Davis-Frye* error here, if any, was harmless beyond a reasonable doubt because of the other evidence of defendant's guilt adduced at trial."[8]

We retained jurisdiction.[9] The hearing on the admissibility of the bloodstain evidence was held in the circuit court, and the record was transmitted to us. Our order did not require the circuit judge to file findings of fact, and he did not do so. Supplemental briefs were filed, and the cause was reargued.

II

Evaluating the scientific community's acceptance of the reliability of electrophoresis of dried evidentiary bloodstains presents some unusual problems. The number of scientists not working for a police agency who are familiar with electrophoresis of evidentiary bloodstains is small. If these scientists alone were considered, the community would be too small for a fair sampling of scientific opinion. There is, however, a larger number of nonforensic scientists using electrophoresis who are capable of evaluating the reliability of electrophoresis of evidentiary bloodstains if presented with the information they need to fill the gaps in their own knowledge and experience. The two groups combined constitute a group of scientists large enough to make a fair determination of whether electrophoresis of evidentiary bloodstains

[7] *People v Young*, n 1 *supra* at 17.

[8] *People v Young*, n 1 *supra* at 24.

[9] *People v Young*, n 1 *supra* at 25.

is generally accepted by experts in the scientific community.

The prosecution has the burden of establishing this community's general acceptance of the reliability of electrophoresis of evidentiary bloodstains. In the instant case, there is disagreement within the community on three separate issues: the length of time that genetic markers, particularly erythrocyte acid phosphatase (EAP), can be accurately read in dried blood, the reliability of the thin-gel multisystem analysis, and the effects of crime-scene contaminants. The prosecution did not fulfill its burden respecting the last two issues raised by the defense.

The only prosecution witness having substantial experience with electrophoresis of evidentiary bloodstains relied on his own unpublished observations and an unpublished reliability study by the developer of the multisystem to conclude that the thin-gel multisystem analysis was reliable. A defense witness questioned both the reliability of the technique and the study. The other prosecution witnesses were unfamiliar with the thin-gel multisystem, and their conclusion about the reliability of the method was based on the absence of any study showing that it did not work. No independently conducted reliability study supported that conclusion. Another defense witness said that the scientific community would not agree on the reliability of that conclusion without better supporting evidence.

Nor have comprehensive control tests been run with respect to the effects of crime scene contaminants. Prosecution witnesses testified, on the basis of their experience with bloodstains drawn under laboratory conditions, that they can identify bacterial contamination, at least if it is of the type normally encountered. They also claimed that bac-

terial contamination has not affected the reliability of the electrophoretic tests they have conducted. This is, however, the type of self-verification considered inconclusive in the scientific community. The record does not indicate that any work has been done on the effects of soil and chemical contamination on the reliability of electrophoresis.

We conclude that the scientific community's general acceptance of the reliability of electrophoresis of evidentiary bloodstains has not been established in the instant case. Reliability remains in dispute and unresolved because of the questions unanswered. The questions are not likely to be answered and the reliability of electrophoresis of evidentiary bloodstains established until independently conducted validation studies on the thin-gel multisystem analysis are undertaken and comprehensive control tests evaluating the effects of different contaminants are run, and the results have been subjected to the scrutiny of the scientific community. The evidence produced by electrophoresis should, therefore, not have been admitted.

If it were clear that the erroneous admission of the electrophoresis evidence had not prejudiced the defendant, a new trial would not be required. In the instant case, however, it is not clear the error was harmless. The only witness testifying about electrophoresis at the trial said that this new technique was reliable and that the test results showed that only a small percentage of the population could have had the protein subtype and ABO combination found in the blood at the crime scene. It does not clearly appear that the other evidence offered by the prosecution would have dispelled all reasonable doubts in the jurors' minds.

III

Mitchell Lechtanski was last seen alive at 8:00 A.M. on May 16, 1978. At 11:00 A.M., Lechtanski's housekeeper entered his house and found its contents disturbed. She left immediately and called the police. At 11:30 A.M., police officers entered the house and found Lechtanski's body. There was a great amount of blood. The scene was secured and assistance summoned.

At 1:30 P.M., a detective found a trail of blood leading from Lechtanski's driveway to an intersection near a parking lot. Bloodstains were also found on the floor of the rear porch and on a stairway near a window that had apparently been broken to gain entry to the house.

At 3:55 P.M., State Police Crime Laboratory personnel arrived. A laboratory scientist used a damp cloth to obtain samples of dried blood from the sidewalk, stairway, and porch. Detective Stolorow received the stains at the end of May. The stains were accompanied by a brief description of "the location from which that blood was collected . . . ."

The first electrophoretic testing was conducted on June 5.

> Electrophoresis is a physical method for the separation of biologically important proteins through the use of electric current. Proteins are very complex molecules which assume positive, negative, or neutral charges, depending on the solution in which they are placed. When these charged molecules are placed on an appropriate medium and subjected to an electrical field, they will migrate toward the pole of the opposite charge. Blood proteins vary in size, shape, density, and charge; consequently they vary in electrophoretic mobility. Therefore, after electrophoresis,

they are separated into distinct bands on the supporting medium.[10]

The distinct bands form characteristic patterns that reveal the protein subtypes.

The samples were tested for five different proteins: phosphoglucomutase (PGM), esterase D (ESD), glyoxylase 1 (GLO), erythrocyte acid phosphatase (EAP), and haptoglobin (HP). Three of the genetic markers, ESD, PGM, and GLO, were tested simultaneously using a thin-layer starch gel multisystem analysis. The other two genetic markers were tested individually.

A test can yield no interpretable result, or it can reveal the specific subtype of a protein. Protein testing, like ABO blood-type testing, does not give a "yes-or-no" answer, rather, it indicates insufficient information, or it provides the subtype (i.e., for ABO: A, B, AB or O; for PGM: PGM, PGM 1, PGM 2, or PGM 2-1).

The electrophoresis of the dried bloodstain on the stairway yielded no interpretable results for all five of the genetic markers in question. The results of the test of the sidewalk stain were as follows: no detectable activity for HP and GLO, type B for EAP (the first run was reported as inconclusive), type 2-1 for ESD, type 2-1 for PGM (the first run was reported as inconclusive). The results of the porch stain were as follows: no detectable activity for GLO, type B for EAP, type 2 for HP, type 2-1 for ESD (the first run was reported as a questionable type 1 for ESD), and type 2-1 for PGM. The tests were not repeated even if there had been inconsistent test readings.

---

[10] Grunbaum, "Potential and Limitations of Forensic Blood Analysis," in *Handbook for Forensic Individualization of Human Blood and Bloodstains,* quoted in Jonakait, *Will blood tell? Genetic markers in criminal cases,* 31 Emory L J 833, 840 (1982).

The protein subtypes from the sidewalk and porch stains matched those of Young, but not those of Lechtanski.

At trial, Detective Mark Stolorow testified that less than 1.3 percent of the population has the protein subtype and ABO combination found in the sidewalk stain and one-half of one percent has the subtype and ABO combination found in the porch stain.[11]

IV

On the first submission of this appeal, this Court said that as "unanimous precedent unequivocally demonstrates, the party offering novel scientific evidence has the burden of demonstrating general scientific acceptance for reliability among impartial and disinterested experts before the evidence may be admitted."[12]

The general acceptance rule is designed to "prevent the jury from relying on unproven and ultimately unsound scientific methods."[13] It recognizes that jurors are "scarcely" prepared to evaluate "complicated, scientific testimony concerning the theory and operation of the devices in the face of a difference of scientific opinion as to their accuracy."[14] Leaving the decision to disinterested and

[11] *People v Young,* 106 Mich App 323, 327; 308 NW2d 194 (1981). The difference between the sidewalk and porch stains was that the PGM test could be interpreted on the sidewalk stain, but not on the porch stain.

[12] *People v Young,* n 1 *supra* at 21, n 7. See also *People v Tobey, supra* at 144-145; *People v Barbara, supra* at 358, 376.

[13] *People v Gonzales,* 415 Mich 615, 623; 329 NW2d 743 (1982).

[14] *People v Barbara, supra* at 364-365.
The opinion for affirmance states:

If there is a question regarding the sample offered as the basis for the opinion in this case with regard to potential error in age of the marker, the fabric from which it was obtained, the

impartial experts in the scientific community assures that those best qualified to assess the reliability of a scientific method do so.[15] Although requiring the technique to "attain sufficient currency and status to gain the general acceptance of the relevant scientific community" inevitʊly creates some delay in the admission of the type of proof supplied by a new technique, the delay is deemed necessary to assure that the technique is trustworthy.[16]

V

At the evidentiary hearing to determine the

particular test used or other factors going to the foundation of the expert opinion, these are factors to be evaluated by the trial court in its traditional function of determining admissibility, MRE 103, 104. If the test results are determined preliminarily to be admissible, facts affecting the weight and credibility of the opinion may, of course, be placed before the fact-finder. *Post* at 521.

That approach is not consistent with the rationale of the general scientific acceptance test which substitutes, where a new technique is involved, the crucible of general scientific opinion for judge or jury assessment of the competing claims of expert witnesses in the belief that one cannot confidently rely on a judge or jury to resolve accurately a dispute concerning the legitimacy of a new technique.

In all events, if a judge or jury were to be permitted to make the determination of reliability, then the *Frye* test would in effect be overruled because then a judge or jury could decide that a new technique was reliable without regard to whether it had achieved general scientific acceptance.

Both this opinion and the opinion for affirmance have examined in considerable detail this new scientific technique and the evidence offered by the competing experts. We have done so not because we believe that we are competent to decide whether the new technique is reliable, but rather to indicate the extent of the scientific debate concerning its reliability, the difficulty in determining which of the competing claims is correct, and the need for continued reliance on general scientific acceptance lest a judge or jury, despite the best of efforts, fail to perceive a fundamental flaw in a new technique that objective scientific scrutiny would reveal.

[15] Giannelli, *The admissibility of novel scientific evidence:* Frye v United States, *a half-century later,* 80 Colum L R 1197, 1207 (1980).

[16] *United States v Addison,* 162 US App DC 199, 201; 498 F2d 741 (1974).

reliability of electrophoresis of evidentiary blood-
stains, the prosecution presented seven witnesses,
and the defense presented two witnesses. The pros-
ecution and defense each presented one forensic
scientist having substantial experience with elec-
trophoresis of evidentiary bloodstains. Three of the
prosecution's witnesses and the other defense wit-
ness were geneticists, familiar with electrophore-
sis, but unfamiliar with electrophoresis of eviden-
tiary bloodstains. The other three prosecution wit-
nesses were technicians, two of whom were full-
time employees of law enforcement agencies. Be-
fore analyzing their conclusions it is first neces-
sary to determine whether some or all of them are
"disinterested and impartial experts in the partic-
ular field."[17]

Because a theoretical understanding is essential,
the relevant scientific community is scientists not
technicians.[18] Practical experience with the pro-
cess, however, is also necessary.[19] Ideally the com-
munity would be scientists with direct empirical
experience with the procedure in question.

Two of the witnesses fit this description. Dr.
George Sensabaugh is an associate professor of
public health at the University of California at
Berkeley and a specialist in forensic science. He
has also conducted electrophoretic studies of dried
bloodstains. Dr. Benjamin Grunbaum is a retired
biochemist from the University of California with
a specialty in criminalistics, the science of identifi-
cation of physical evidence in criminal cases. He

[17] *People v Young, n 1 supra* at 5, 27; *Barbara, supra* at 358; *People
v Tobey, supra* at 147.

[18] *Barbara, supra* at 377. See also *People v Greenwood Brown,* 40
Cal 3d 512, 530; 220 Cal Rptr 637, 645; 709 P2d 440 (1985). ("The
witness must have academic and professional credentials which equip
him to understand both the scientific principles involved and any
differences of view on their reliability.")

[19] *Barbara, supra* at 376-377.

has been recognized to be "a leader in the development of electrophoresis to test body-fluid enzymes for purposes of forensic identification."[20]

Grunbaum and Sensabaugh appear to be a part of a small community of scientists doing work on electrophoresis of evidentiary bloodstains.[21] The number of scientists within this community willing to testify seems even smaller. Grunbaum, Sensabaugh, and Mark Stolorow, the police detective who did the electrophoresis in the instant case, figure prominently in the few reported cases involving electrophoresis of evidentiary bloodstains.[22] Those cases might be described as reflecting and reporting a debate between Stolorow and Grunbaum.

An argument could be made that neither Grunbaum nor Sensabaugh are disinterested and impartial, and should therefore be excluded despite their expertise. Grunbaum was the leader of. the team of scientists that sought to develop a bloodstain analysis system for use in crime laboratories. He brought in Brian Wraxall and Stolorow to work on the project. After expressing dissatisfac-

[20] *People v Greenwood Brown*, n 18 *supra*, 40 Cal 3d 532, n 4.

[21] Jonakait, n 10 *supra* at 853. Grunbaum invited Brian Wraxall and Mark Stolorow to join him at the University of California at Berkeley to develop the multisystem. Sensabaugh has collaborated with Wraxall. As the defense commented in its brief in this Court, Grunbaum and Sensabaugh "appear to be the only such [independent] scientists in the country with regard to evidentiary bloodstain electrophoresis." See also *Graham v State*, 168 Ga App 23, 24; 308 SE2d 413 (1983) (Deen, J., concurring).

[22] *Greenwood Brown*, n 18 *supra* (Grunbaum testified for the defense, Sensabaugh's publications cited by the court to support both prosecution and defense); *State v Pearson*, 234 Kan 906; 678 P2d 605 (1984) (Grunbaum testifying for the defense); *State v Washington*, 229 Kan 47; 622 P2d 986 (1981) (Stolorow for the state, Grunbaum for the defense); *People v Harbold*, 124 Ill App 3d 363; 464 NE2d 734 (1984) (Stolorow for the state). Compare *Tobey, supra* at 146, n 9, a polygraph case where this Court noted "It is . . . impossible to overlook the fact that in every case discussed, [the same two people] have been the key—and sometimes the only—expert witnesses."

tion with the multisystem being developed, he withdrew from the project and suggested that it be discontinued. The project continued and when the results were published, he claimed they included misrepresentations. An independent review group found no grounds for Grunbaum's charges, but the sponsors of the project decided not to publish its results. Arguably, Grunbaum is still seeking to vindicate his original position. Sensabaugh also is not clearly disinterested. He has been a collaborator with Brian Wraxall and a paid consultant with the Oakland Crime Laboratory.[23] He has also contributed to a prosecution response to an amicus curiae brief in a case pending before the California Supreme Court.

Nevertheless, a certain degree of "interest" must be tolerated if scientists familiar with the theory and practice of a new technique are to testify at all. The standard developed by this Court is whether the expert's "livelihood was not intimately connected with the new technique."[24] The

[23] Grunbaum is also a consultant, but without pay, to a crime laboratory.

[24] *Tobey, supra* at 145; *Barbara, supra* at 358, 376.

The author of the opinion for affirmance states that she does "not advocate that this Court abandon the *Frye* test," but would "reject the requirement that the reliability of novel scientific evidence must be established by disinterested witnesses, *People v Barbara*, 400 Mich 352; 255 NW2d 171 (1977), and *People v Tobey*, 401 Mich 141; 257 NW2d 537 (1977), that is, those whose livelihood is not 'intimately connected with the new technique.' " *Post* at 511. The opinion adds that the author does not "see a basis for expansion of the rule." *Id.*

The words "livelihood is intimately connected with the new technique" are not an "expansion of the rule," but were stated by this Court in *People v Barbara, supra* at 376, as follows:

While one would not want an expert witness without experience or background in the technical field, one would want, where the task was to demonstrate general scientific acceptability, an acknowledgment of the value of the device and the techniques by disinterested scientists whose livelihood was not intimately connected with it.

livelihood of Stolorow and James Kearney, the
prosecution witness who directs the FBI serology
laboratory, is intimately connected with the new

These words were repeated and reaffirmed by this Court in *People v
Tobey, supra* at 145.

While the interest of a witness may be considered by the trier of
fact in assessing credibility, it does not follow that the witness' self-
interest does not bear on the question whether there has been general
scientific acceptance.

To allow general scientific acceptance to be established on the
testimony alone of witnesses whose livelihood is intimately connected
with a new technique would eliminate the safeguard of scientific
community approval implicit in the general scientific acceptance test.
Scientific community approval is absent where those who have devel-
oped and whose reputation and livelihood depends on use of the new
technique alone certify, in effect self-certify, the validity of the tech-
nique. As stated by this Court in *People v Barbara, supra* at 358:

> There was no testimony by disinterested and impartial ex-
> perts "in the particular field [physiological and psychological]
> in which it belongs" (*Frye* test), and thus no demonstration of
> "general scientific recognition of such [polygraph] tests" (Michi-
> gan rule).

If this Court were to adopt the view that the testimony of persons
who have developed and whose reputation and livelihood depends on
the use of a new technique alone supports admissibility, then the
views of the developer and his disciples would be substituted for the
scrutiny of the marketplace of general scientific opinion and the
substance of the *Frye* test would be eliminated.

The opinion for affirmance states:

> The "livelihood . . . intimately connected with the new tech-
> nique" test represents a regressive approach to scientific devel-
> opments which, parenthetically, would have devalued the opin-
> ions of Jonas Salk, Albert Einstein, or Marie Curie, each of
> whose life work, livelihood, and standing in their professional
> community was intimately connected with a new scientific
> procedure. [*Post* at 515.]

Salk's vaccine, Curie's work, and Einstin's theories were subjected
to the most painstaking and extensive analysis by countless members
of the scientific community before they were regarded as reliable.
Salk, Curie, and Einstein have been accepted in the pantheon because
they have passed the rigid test of acceptance by the general commu-
nity of scientists, not simply on the basis of self-verifying studies. The
experience with the paraffin test and the Dalkon Shield (see n 54 and
accompanying text) is again relevant.

technique. The livelihood of Grunbaum and Sensabaugh is not so intimately connected.[25]

The community of scientists having direct empirical experience with electrophoresis of evidentiary bloodstains does not seem "sufficiently large so that the *Frye* objective of receiving a consensus judgment of the scientific community can be met."[26] The community of nonforensic scientists using electrophoresis is, however, large enough to obtain an adequate sampling of scientific opinion. These scientists have sufficient theoretical understanding and practical experience to be able to evaluate the evidence. The geneticists testifying for the prosecution and the defense are therefore in the relevant community of scientists having experience with electrophoresis.[27] They need only explain the gaps in their own knowledge and experience, and reach general agreement about the reliability of the information they are using to fill these gaps, for their judgment to be respected.

VI

The precise issue in the instant case is whether electrophoresis of evidentiary bloodstains passes

[25] Other states that do not require expert testimony from "disinterested and impartial" persons have relied on the testimony of law enforcement employees. In *Robinson v State,* the Court of Special Appeals of Maryland admitted electrophoresis evidence based solely on the testimony of a police department forensic chemist who said that electrophoresis is generally accepted as reliable by forensic chemists. *Robinson v State,* 47 Md App 558, 574-576; 425 A2d 211 (1981). "Since the court seemed to accept the conclusion that these tests were used almost exclusively in police laboratories, the court was effectively stating that if the scientists employed by the law enforcement agencies testify that the test is reliable, then the evidence should be admitted." Jonakait, n 10 *supra* at 859. The decision in *Robinson* has been questioned. See *Greenwood Brown,* n 18 *supra;* Jonakait, n 10 *supra* at 859.

[26] *Giannelli,* n 15 *supra* at 1209.

[27] We do not mean to suggest that geneticists are better qualified than other scientists having experience with electrophoresis. The scientists with electrophoresis experience in the instant case just happened to be geneticists.

the general acceptance test. General acceptance of electrophoresis in other areas is not necessarily relevant. The defendant concedes that serological electrophoresis of fresh blood in paternity testing and genetics research is considered generally reliable.[28] Electrophoresis of evidentiary bloodstains presents, however, a number of complications, particularly the electrophoresis conducted in the instant case. The complications are the bloodstain is not fresh, it is tested by thin-gel multisystem analysis, and, most importantly, it has possibly been exposed to unknown contaminants.[29]

A

Electrophoresis for paternity testing and genetics research is generally done on fresh blood. Electrophoresis of evidentiary stains is for the most part done on dried blood. "There is no difference in methodology from fresh blood to dried blood except in preparation of the samples and the extra care that must be exercised in interpretation of results when degraded material is studied."[30] The important difference is that the blood is not fresh, and blood begins to degrade as soon as it

---

[28] See also *Greenwood Brown,* n 18 *supra,* where the court said:

> Here, defendant does not seriously dispute the scientific validity of genetic typing tests in general. Rather, he and Dr. Grunbaum focus on the large body of literature which suggests that drying, aging, temperature, contamination (particularly with bacteria or other organic substances), and unknown composition of the test sample—conditions often encountered in forensic work—can affect test results in varying degrees. The defense suggests that no standard, proven, and accepted methodology exists to avoid these dangers.

[29] Some of these problems figure to a lesser extent in electrophoresis of nonevidentiary stains.

[30] Grunbaum, "Procedures for Phenotyping of Genetically Controlled Enzyme and Protein Systems," in *Handbook for Forensic Individualization of Human Blood and Bloodstains* at 51, 103, quoted in Jonakait, n 10 *supra* at 842.

leaves the body.[31] The "crucial question is whether the marker detected in aged blood is a reliable indication of that found in fresh blood from the same person."[32] The dispute centers on the results of the EAP test.

The defense raised the possibility of misreadings caused by the deterioration of aged blood. According to Dr. Grunbaum blood degrades very rapidly. In the EAP system, the problem is said to be particularly acute, because the banding patterns for the B, C, and CB types are similar. In the instant case, the sidewalk stain was typed B although originally the reading was inconclusive.

Grunbaum suggested that the A band of the BA type could be lost through decay resulting in a BA that looked like a B. Testifying for the prosecution Sensabaugh agreed that a degraded BA might have been typed a B, but he said the change would signal itself. Grunbaum's response was "if the A degrades faster there can be a . . . time where you will see only the B isoenzyme, and you will not see the A isoenzyme, and you will miscall this as a type B. The explanation given here by Sensabaugh that there is [sic] some guidelines to identify this still as a BA, really do not hold in degraded material, namely the seeing of the secondary B, because in degraded material the clarity of these bands and the resolution is very obscure."

The question of EAP deterioration was addressed in *State v Washington,* 229 Kan 47, 55; 622 P2d 986 (1981). The witnesses were Grunbaum and Stolorow, testifying for the defense and prosecution, respectively. The court rejected Grunbaum's

---

[31] See *Greenwood Brown,* n 18 *supra,* where the court noted, "The People concede the problem of sample deterioration [but] urge . . . that the [genetic markers] accepted for forensic testing are those most resistant to adverse conditions."

[32] Jonakait, n 10 *supra* at 879.

contention, saying, "Grunbaum used a different medium [and] the State produced *two separate pieces* of evidence showing the contrary—that EAP did not rapidly deteriorate . . . ." (Emphasis supplied.) A commentator has suggested that the first "assertion is particularly interesting, since Grunbaum's published work has shown that false EAP positives are obtained on both mediums—cellulose acetate membranes and starch gel."[33] The commentator continued, "the court's counting of evidence may have been wrong."[34] It appears that "it was not two pieces of evidence contradicting Grunbaum that were given, but rather one piece under two guises."[35] The "piece" of evidence was the "Denault" study that showed that EAP isoenzymes can be correctly identified in dried laboratory-produced bloodstains for up to thirteen weeks.[36]

Grunbaum's criticism that degraded samples cannot be reliably typed also appears to be based on a limited study:

> Grunbaum took four different known samples, allowed a portion of each to dry under ambient conditions and heated the remainder for up to 48 h at 37°C. All samples were then subjected to electrophoresis and identified by four skilled technicians. Of the dried samples, two were correctly identified by all four technicians, a third sample was correctly identified by three technicians, with the fourth technician reaching no conclusion as to the isozyme. The fourth sample was correctly identified by one technician. Two were unable to identify it, and the fourth technician misidentified it.

[33] Jonakait, n 10 *supra* at 904.

[34] *Id.* at 870, n 120.

[35] *Id.* at 871, n 120.

[36] Denault, Takimoto, Kwan, Crim & Pallos, *Detectability of selected genetic markers in dried blood on aging,* 25 J Forensic Sciences 479 (1980).

Only one of the heated blood samples was correctly identified by all four technicians. One sample was correctly identified twice, misidentified twice, and not identified twice. The last sample was misidentified by three technicians and not identified by one. As the authors pointed out, the treatment of neither the bloodstains nor the heated liquid blood was extreme as compared to real life situations. The technicians were highly trained, yet they misidentified isozymes 7 out of 32 times, for an error rate of 21.8%. Furthermore they correctly identified the isozyme only 53.1% of the time.[37]

Despite the small sample used in Grunbaum's research, Sensabaugh cited Grunbaum's work as authority in an article in which he warned, "[t]he 'A' isozymes are more labile than the 'B' and 'C' isozymes; thus in BA heterozygotes the more labile 'A' isozymes may be lost, giving an electrophoretic pattern looking like 'B' homozygote. . . . It would be good to have a better understanding of how the biochemistry of this marker dictates its behavior."[38]

The Denault study, which was also cited in Sensabaugh's article, was a more thorough study.[39]

A perusal of the literature further clarifies the dispute in the field. A scientist writing before the Denault study appeared concluded "the [EAP] enzyme is not particularly stable in dried bloodstains and hence they have to be not more than 2-3 weeks old for successful typing. Older stains can

---

[37] Juricek, *The misapplication of genetic analysis in forensic science,* 29 J Forensic Sciences 8 (1984). Compare Jonakait, n 10 *supra* at 905, describing what appear to be the same tests.

[38] Sensabaugh, *Uses of polymorphic red cell enzymes in forensic science,* 10 Clinics in Haematology 185, 204 (1981).

[39] Jonakait, n 10 *supra* at 881, 903 ("The [Denault] group . . . has made the most thorough study of how aging conditions affect the persistence of genetic markers . . .").

give spurious results."[40] The stain in the instant case was less than three weeks old. Another scientist who did a case study of EAP type CB concluded it could be misread as type C. He did suggest, however, that an awareness of the pitfalls associated with degraded EAP samples "will help to eliminate possible misinterpretations."[41]

Despite these disagreements, if the only question about the reliability of electrophoresis of evidentiary bloodstains was the survivability of degraded samples, it would be questionable whether electrophoresis evidence should be excluded where the bloodstain is less than three weeks old. The most detailed independent study discussed by the scientists suggests degraded EAP markers can be accurately read up to thirteen weeks. Before this study was written, other scientists believed EAP markers could be accurately read up to two to three weeks, which was the length of time involved in the instant case. The main support for the defense's critique of the studies are test results from too small a sample to carry much weight in the scientific community.

B

The second point of contention is the reliability of the thin-gel multisystem used in the instant case, which simultaneously analyzes three genetic markers, PGM, ESD, and GLO, on a single, thin-layer starch gel. Although other combination systems exist, the multisystem was designed by police scientists for police work; it allows the maximum amount of information to be drawn from electrophoresis of a small stain.

[40] Baird, *The individuality of blood and bloodstains,* 11 J Can Soc Forensic Science 83, 121 (1978), quoted in Jonakait, n 10 *supra* at 903.

[41] Yeshion, *Thermal degradation of erythrocyte acid phosphatase isozymes in a case sample,* 25 J Forensic Sciences 695, 697 (1980).

A specific question raised is whether the filter used in the test of the ESD molecules has the unintended effect of compromising the analysis of the PGM and GLO molecules. Because the results of the GLO test were not interpretable in the instant case, the only issue is the reliability of the PGM results in the multisystem analysis.

The defense argues that the thin-gel multisystem is unreliable with respect to dried blood because the blood sample is too marginal to begin with to be accurately read after further diffusion. Once the electrophoretic separation has been conducted, a filter paper containing a chemical reagent is placed over the gel. The filter paper is meant to stain the ESD molecules, but it also soaks up PGM molecules.[42] Grunbaum says this "compromises" the PGM test because "the PGM molecules have diffused sideways, some have disappeared . . . [and] the intensity of the PGM bands are not the same as if they were stained first, before the ESD."[43] Grunbaum said he could "deduce from the photographs [taken of the test] that a leaching out of the PGM has occurred and you can see it very well" in the instant case.[44] The defense argues that the multisystem "aggravates" the problem inherent in analyzing degraded samples.[45]

[42] Grunbaum suggested that a second filter paper is added causing further diffusion, but the prosecution denied the use of a second paper.

[43] The opinion for affirmance quotes Grunbaum as saying that "there are many competent analysts in the country that can do it with a great deal of confidence." *Post* at 516. The "it" that Grunbaum was talking about was not the thin-gel multisystem method of analysis. Grunbaum said that "at the present state of the art, it [electrophoresis of evidentiary bloodstains] is unreliable." He defined reliability as "you can't miss." Confidence is "something that you allow for a certain error that is inadvertent."

[44] Grunbaum has not researched this question. He is deducing the problem from the obscurity of the photographs.

[45] Whether the defense is arguing that the overlap leads to inconclusive or incorrect readings is not clear from the record.

The defense further argues that no independent study verifying the reliability of the thin-gel multisystem has ever been published. No prosecution witness contradicted this argument. The developer of the thin-gel multisystem, Brian Wraxall, did conduct his own blind trials,[46] but self-verification is not a sufficiently reliable procedure.[47]

---

[46] This study is what Sensabaugh was referring to when he said blind trials conducted between four laboratories established the reliability of the multisystem.

[47] See Giannelli, n 15 *supra* at 1213; Dr. Juricek testified that self-verification was against the scientific tradition. Independent verification was deemed necessary to eliminate bias.

The opinion for affirmance states:

> These blind trials were not "conducted" by Mr. Wraxall. Rather, five batches of six bloodstains, each of various ages, were sent to serologists in their own labs, for typing of eight genetic markers. Thus, while it appears that the examiners knew what they were looking for, the tests were blind in the sense that the examiners did not know the identity of the markers in the particular sample. Of a total of 912 readings, only one reading was incorrect. Wraxall, p B-7.
>
> Subsequent blind trial proficiency tests for laboratories using the multisystem and those using other systems were conducted by the Forensic Science Foundation from 1979 to 1983. The sum total error rate on individual marker analyses was 1.6 percent of 3107 total tests per protocol. [*Post* at 523-525.]

Grunbaum, the original project director, claimed that the results of the "final report," stating that only one of the 912 readings was incorrect, had been falsified. The findings of a panel convened to review the report have also been the subject of a dispute. The prosecution claims the panel concluded there were minor discrepancies but no support for Grunbaum's allegation, while the defense contends the panel concluded that any manipulation of experiments and results did not take place at the managerial level. The Law Enforcement Assistance Administration, the sponsor of the research, decided not to publish Wraxall's final report.

The statement that the reliability of thin-gel multisystem analysis *is* demonstrated by proficiency tests *conducted* by crime labs using the multisystem and other combination tests should be read in conjunction with the acknowledgment that it is not known how many of the labs used the multisystem. Without more information, no conclusion can properly be drawn concerning the reliability of Wraxall's multisystem analysis.

Even *if that error were to be ignored, the confidence expressed in the statistics remains questionable.* While the sum total error rate on

The prosecutor's response was to present wit-
nesses who have done electrophoresis with other
combination tests.[48] Dr. Rachael Fisher and Dr.
Harvey Mohrenweiser have used combination sys-
tems involving a thick-slab starch gel. Grunbaum
distinguished the thick- from the thin-gel combina-
tion system. "They [those using the thick gel] slice
their gel in such a way that they had several
layers, like a layer cake, and they had fresh sur-
faces, and they stained only one for a given sys-

individual marker analysis was 1.6 percent of 3107 total tests per
protocol, the error rate per sample of blood was 10.9 percent of the
total samples. This is because the number of samples was "substan-
tially less than three thousand," four or five tests being performed on
each sample. Also it appears that the Forensic Science Foundation
factored out "incompetent" analysis, which means the actual error
rate was higher.

[48] The opinion for affirmance states: "It may, however, be noted
that combination analysis, or a system that analyzes more than one
enzyme at a time, is routinely used and accepted as reliable in the
scientific community." Post at 523.

There are a number of different combination methods. The method
used in the instant case was a thin-gel combination method. Both the
thin-gel and the thick-gel method test markers simultaneously, but
the thin-gel involves overlapping tests on the same surface, while the
thick gel is sliced so the tests take place on different surfaces. See
post at 523, 524. The statement that combination analysis is "rou-
tinely used and accepted as reliable in the scientific community," is
placed in perspective upon examination of the cited references which
do not support the claim of routine use and acceptability in the
scientific community. Two scientists said, "It is standard practice in
our lab to . . ." (emphasis supplied). One of the two scientists was
referring to a thick- and not a thin-gel combination system, and the
other seems to be doing the same although there is some ambiguity in
his testimony. Their testimony, also, concerns a different kind of
multisystem combination test than the one used in the instant case.

The opinion for affirmance states: "The testimony reveals that a
combination method for the three markers tested simultaneously in
this case, PGM, ESD and GLO, is used in genetic research in the
Departments of Pediatrics and Pathology at Michigan State Univer-
sity."

The combination method referred to is one other than the one used
in analyzing the bloodstains in the instant case. The method referred
to is a thick-gel combination test, not the thin-gel test used in the
instant case. Also, genetics research is done with a different kind of
sample than an evidentiary stain. An evidentiary bloodstain tends to
be "marginal." The samples used in genetics research are not mar-
ginal.

tem. So this was not a compromising system."
Testimony by at least one of the prosecution wit-
nesses suggested there was some overlap on at
least one of the combination systems he used. He
did not think the overlap compromised the system:
"[W]e will use the fluorescent stain for EAP . . .
[and] put the PGM stain on top . . . [but] because
we have gone from a fluorescent to a visible stain
. . . the two do not interfere with each other."[49]
There was no further testimony by either side to
resolve the dispute about the effect of the overlap-
ping tests.

The prosecution also asked the scientists using
the other combination tests why they believed the
thin-gel multisystem was reliable. Their collective
response could be summarized in the following
comment by Dr. Rachael Fisher, "I have no reason
to suppose it wouldn't work." They testified that
they had seen no study demonstrating that the
multisystem was unreliable. This line of reasoning
would be adequate if the burden of establishing
general acceptance of *unreliability* were placed on
the defense. The burden of establishing general

[49] The opinion for affirmance states: "A combination method involv-
ing two sequential markers on the same gel is also in use at the
University of Michigan Medical School, and a combination method
was used for three years at the Minneapolis Blood Bank." *Post* at 523.

The scientist who testified about sequential staining said he had not
done a combination test of PGM, ESD, and GLO on a thin gel. Sequential
staining was done on "different positions on the gel or where the first
stain does not interfere with the second stain." The defense presented
testimony that the overlays of ESD and PGM in the instant case were
"on the exact same spot on the gel" and that the ESD test compro-
mises the PGM test.

The method used by the blood bank was not the method Wraxall
used in the instant case. The blood bank had experimented with
Wraxall's simultaneous analysis of PGM, ESD, and GLO on a thin-layer
starch gel, and decided not to use that method of analysis.

Footnote 20 of the opinion for affirmance refers, we believe, to
electrophoresis of fresh blood in paternity testing and genetics re-
search. See *post* at 523. Such tests do not involve evidentiary stains or
thin-gel multisystem analysis.

acceptance of *reliability* is, however, on the prosecution.

In sum, there are substantial unanswered questions respecting the reliability of Wraxall's thingel multisystem. Conflicting expert testimony indicates that until independent verification tests have been conducted regarding the thin-gel multisystem, general agreement in the scientific community on the reliability of that multisystem is unlikely. A specific question left unresolved is whether the filter used in the test of the ESD molecules compromises the analysis of the PGM molecules.

C

The reliability of blood degraded by dirt, gasoline, urine, sweat, and other possible crime scene contaminants is also at issue in the instant case. Electrophoresis for paternity testing and genetics research is not beset with these problems. The only scientists that have done electrophoresis of blood exposed to these contaminants are those with forensic experience.

Both witnesses for the defense, Grunbaum and Dr. Diane Juricek, testified that it is not possible to determine the reliability of electrophoresis of evidentiary bloodstains until the effects of crime scene contaminants are understood. Juricek said that for electrophoresis of evidentiary bloodstains to be accepted as reliable, scientists would have to study the effects of "common gasoline contaminants which appear on sidewalks, DDT, which can, you know, from spraying grass . . . appear . . . . There is [sic] also bacterial contamination possibilities. There are molds that could have an effect." Although Juricek would not say for certain whether the contaminants would affect the electro-

phoresis, she said there was a "very strong theoretical possibility" that they would. Grunbaum testified "[t]here is just no way of knowing the degree of . . . the humidity, . . . heat . . . bacterial . . . [and], chemical contamination, and . . . this is a range that goes on beyond anybody's imagination."

Both witnesses testified that the reliability of electrophoresis of evidentiary bloodstains would not be established in the scientific community until controlled studies were conducted taking into account the possible contaminants present at a crime scene. Juricek said "[y]ou would have to check all of these different factors . . . singularly and then in combination . . . ." The studies would then have to be published and "verified independently."

It appears from the record and a survey of the scientific literature that such comprehensive control studies have not been conducted.[50]

The prosecution relies instead on inferences drawn from tests performed on dried bloodstains prepared under ideal contamination-free conditions. The only publication referred to by name was the Denault study discussed earlier. Reliance on this study is curious given Denault's own caveat.

> [E]mphasis must be placed on the limitations of this study. It is intended as a starting point for future research. . . . Moreover, the tests were conducted on clean specimens free of impurities. It is realized that in actual practice serological evidence preserved under known and constant conditions is rare, and the specimens may be contaminated with impurities such as perspiration, urine,

---

[50] Jonakait, n 10 *supra* at 878.

soil, and bacteria. These factors limit the application of the results of the study.[51]

When questioned about the proviso, the prosecution's only expert with significant experience with evidentiary bloodstains commented, the cleanliness of the stains is not "as significant a problem as they think it is." The prosecution emphasizes that no study has shown unreliability.

Prosecution witnesses testified about their experience with contaminants. Sensabaugh, relying on his own unpublished laboratory study, said that bacterial contamination would signal itself. He said the person interpreting the test would see "new bands appearing in odd positions . . . ." Fisher also testified that bacterial contamination would result in a "different activity, different position." She suggested the contamination "will flag you . . . ."

Juricek has written, however, that bacterial contamination does not necessarily create easily excludable bizarre bands. "Many bacteria have been found to have Type 2 PGM, for example. Thus, Type 1 blood when contaminated by bacteria that have Type 2 PGM would be identified as Type 2-1 despite the use of starch gels and proper controls."[52] The result of the PGM test in the instant case was Type 2-1.

Fisher was more willing to recognize uncertainty with respect to unknown contaminants. When asked about soil, Fisher answered, "If it is contaminated with soil, I have no idea. It depends on what is in the soil." In response to the judge's comment that "your testimony is that if there was any problem with having to use it [electrophoresis of evidentiary bloodstains] in Court, it would have

[51] Denault, Takimoto, Kwan, Crim & Pallos, n 36 *supra* at 496.
[52] Juricek, n 37 *supra*.

to come from an incompetent examiner who could not catch a flag that a contaminated sample is going to wave," Fisher said, "There are obvious conditions that I have never tested and which nobody else has ever tested." Although she followed up with the comment that "I can't conceive of anybody [having problems], unless one is going to go around sprinkling the place with rare chemicals," the testimony of another prosecution witness, Dr. Harvey Mohrenweiser, suggests that it is only fair to conclude that examiners will "catch flags" they are used to seeing. The court asked Mohrenweiser whether a competent examiner will "be able to separate the contaminated activity from the non-contaminated activity?" Mohrenweiser answered, the examiner "[s]hould recognize that there is a problem . . . they would be able to recognize and identify samples which are contaminated under sorts of conditions that we routinely operate. That's part of the developmental procedure and recognize that it would be inappropriate to type . . . ." The only stains he had examined were those produced in laboratories. Because these stains were not collected under sterile conditions, there could be "some bacterial contamination." Mohrenweiser and the other prosecution witnesses did not respond to the questions raised by the defense about the effect on electrophoresis of other likely crime scene contaminants such as chemicals and soil.

In sum, scientists do not agree what effect common crime scene contaminants may have on electrophoresis. They do not agree because comprehensive control tests have not been undertaken. The scientists testifying at trial had no experience with soil or chemical contamination and could only guess what effect such contaminants might engender. Although the scientists had some experience

with the type of bacterial contamination found in laboratories, the bloodstains here were made during or following the commission of a crime and not under laboratory conditions.

VII

General agreement in the scientific community on the reliability of electrophoresis of evidentiary bloodstains has not been achieved because independently conducted validation tests and control studies have not been undertaken, and the results subjected to the scrutiny of the scientific community. Legal commentators have spoken of the need for comprehensive testing to establish the reliability of a new technique.[53]

The scientific tradition expects independent verification of new procedures. When other scientists analyze and repeat the tests, they counteract the dangers of biased reporting. It is scientists not responsible for the original research that confirm its validity.

Although electrophoresis has been generally accepted as reliable in the scientific community for many years, Wraxall's multisystem test is a new technique. No independently conducted verification studies have been undertaken. Scientists evaluating the technique necessarily base their conclusions on the unpublished reliability study conducted by the multisystem's developer. General agreement in the scientific community cannot be achieved on the basis of this type of testing alone. Independently conducted reliability tests on Wraxall's multisystem could, however, be undertaken without great difficulty. Such questions as whether the filter compromises the subsequent tests would

[53] Jonakait, n 10 supra at 873, 910; Giannelli, n 15 supra at 1225. See also Graham v State, n 21 supra at 24-26 (Deen, J., concurring).

seem to be readily resolvable through independent verification.

The absence of control studies measuring the effects of various contaminants on electrophoresis also stands in the way of general agreement in the scientific community. Although it is clearly not possible or necessary to measure every conceivable contaminant in the environment, or at least every contaminant a defense attorney can imagine, the effects of certain common contaminants such as soil and gasoline could and should be tested. According to the record, their effect is presently unknown. It is not clear whether they alter or remove bands and thereby destroy the reliability of the test or whether they just render the results uninterpretable or create an easily identifiable stray band.

The dangers of allowing implementation of an inadequately tested device are well-known. The paraffin test and the Dalkon Shield are two familiar examples. The paraffin test was used by law enforcement agencies and introduced as evidence in court to establish that a suspect has recently fired a gun.[54] "The theory behind the test was that the results established the presence of particles of nitrates . . . deposited on the hand by the gases of a discharged cartridge."[55] It was not until 1967, over thirty years after the test was accepted as reliable evidence in court, that the first comprehensive study was published conclusively showing "that many people who never fired a gun but whose profession, occupation, or happenstance brought them in contact with nitrates can be expected to yield positive reactions to the test."[56]

[54] Jonakait, n 10 *supra* at 856; Giannelli, n 15 *supra* at 1225.

[55] Moenssens & Inbau, Scientific Evidence in Criminal Cases, § 4.12.

[56] *Id*. See also Jonakait, n 10 *supra* at 856; Giannelli, n 15 *supra* at 1225.

The history of the Dalkon Shield is also instructive. "With adequate testing, controlled studies and cautious marketing, [the manufacturer] could have discovered the increased risks which have been shown to be inherent in the Dalkon Shield's unique new design."[57] Instead, because of its desire to get the new product on the market as quickly as possible, "[t]he defendant relied entirely on [the researcher], who had not only the pride of invention, but also a personal incentive to bias his judgment . . . ."[58]

## VIII

We conclude that the prosecution has failed to demonstrate general acceptance of the reliability of electrophoresis of evidentiary bloodstains by the scientific community.

We turn to the questions whether the error in admitting the electrophoresis evidence was harmless or whether we should remand for a new trial on a charge of second-degree murder.

The erroneous admission of electrophoresis evidence does not necessitate a retrial if it is clear the error did not prejudice the defendant. In the instant case, however, it is not clear the error was harmless.

At trial no one testified about the reliability of electrophoresis except Detective Stolorow. He presented a slide show demonstrating the technique and testified concerning its reliability. As previously discussed, he said that only 1.3 percent of the population has the protein subtype and ABO combination found in the sidewalk stain and one-half of one percent has the subtype and ABO combi-

---

[57] *Hawkinson v A H Robbins Co, Inc,* 595 F Supp 1290, 1307 (D Colo, 1984).

[58] *Id.*

nation found in the porch stain. He said that this meant that one of seventy-seven people would match the sidewalk stain and one of one hundred and seventy-seven people would match the porch stain. Parenthetically, cross-examination at trial did not reveal the absence of independent verification and control studies or other contradictory evidence subsequently raised by Grunbaum and Juricek during the evidentiary hearing.

The prosecution has argued that the admission of the electrophoresis evidence was harmless because of the "abundance" of other evidence.[59] The other proof consisted of ABO blood tests, fingerprints, and the testimony of Terrence Coleman.

No one contests the reliability of ABO blood testing in general or the results of the ABO test in the instant case. The porch and sidewalk stains were identified as blood group O. This has, however, little significance. As Stolorow testified at trial, forty-five percent of the population have type O blood. Young was not even the only suspect with type O blood.

The fingerprints found in the victim's house are more significant. Twenty-three fingerprints were found, but eleven did not have enough points of comparison to be identifiable.[60] Of the twelve remaining prints, ten of these were Lechtanski's. The other two fingerprints which were found on the handles of a toilet and dresser drawer, were ultimately identified as Young's. Questions were

---

[59] *People v Young,* n 1 *supra.*

[60] Points of comparison come from the ridges on the fingers of your hand. "[T]hese ridges will run along and then possibly they will abruptly end. When it does this, we call it a ridge ending. Or . . . some will go along, and they will split, and it forms what we call a bifurcation. And there are five of these various types of points that we use in making an identification. There are the ridge endings, the bifurcations, the short ridges, the ridge dots, and enclosures." See also Moenssens, n 55 *supra* at 350-354.

raised, however, concerning the reliability of the identification.

The fingerprints were compared to the fingerprints of Young on two separate occasions. On May 25, the police laboratory specialist was asked to compare the prints of nine suspects, including Young. The report listed the name of the suspects, with Young's name at the top of the list, and concluded "[c]omparison was made of the latent prints and fingerprints with negative results." The laboratory specialist's explanation at trial of the negative results was that "the only thing I can think of is that I had the cards on my desk, that I had some that I hadn't compared and some that I had compared. I either picked up two cards and stuck his card in with the one possibly above it, or I just put them in the wrong stack to begin with and apparently didn't compare his card at the time."

On June 13, however, the laboratory specialist was asked once again to compare Young's fingerprints with the two prints found in the house. This time he concluded that the fingerprints "were made by the same person." He said there were eight points of comparison between the thumb print found on the toilet handle and Young's thumb print and more than twelve points of comparison between the fingerprint found on the bottom drawer handle and Young's right little finger.

Experts generally require that "a minimum of eight identical ridge characteristics . . . be found in both prints, though most experts prefer at least 10-12 concordances."[61] Although both prints meet the minimal requirements, the fingerprint from the toilet handle just clears the threshold. Of the two fingerprints, the print on the toilet handle is

---

[61] Moenssens, n 55 *supra* at 366.

the most important. The reason is the toilet handle fingerprint would have probably been made recently, because "any print that would be put on there would be . . . destroyed by the next person that . . . flushes the toilet." Fingerprints can last a long time, and defense counsel suggested to the jury that the second print might have been made at an earlier date. During cross-examination of a police officer, who testified that Young said he did not know Mitchell Lechtanski and had never been to his house, defense counsel asked "couldn't Mr. Young have known him by simply a name Mickey?"[62] The detective had not shown Young pictures of Lechtanski or the house.

An acquaintance of Young, Terrence Coleman, testified that the day before the murder he encountered Young on the street and asked what his plans were for the next day, May 16. Coleman testified that Young responded he was planning a robbery on the north side of town. Coleman said he met the defendant the next day and asked him about the murder of Lechtanski: "I asked him if he did it. And he said he did, and the only reason why he did do it because he was coming after him with a blunt object . . . ."

The reliability of Coleman's statements depends on his credibility as a witness. Before the murder he had been convicted of driving away a motor vehicle and delivery of marijuana. Although he said he spoke to Young on May 16, Coleman did not tell the police what he knew until October 26, when he was in jail on charges of possession of stolen merchandise. When he testified at Young's trial, there were charges pending against Coleman. Coleman said, however, that no promises had been made for his testimony.

---

[62] Mickey or Mick seems to be how he was addressed in the bar which he frequented.

As an appellate court, we do not independently evaluate this evidence. "[I]t is not the appellate court's function to determine guilt or innocence. . . . Those judgments are exclusively for the jury . . . ."[63] Our responsibility is to determine how the error might have affected the jury's decision. The inquiry is "what effect the error had or reasonably may be taken to have had upon the jury's decision."[64]

If it were clear that the erroneous admission of the electrophoresis evidence did not prejudice Young, the error would be harmless. We are, however, of the opinion that but for the electrophoresis evidence the jury may have had a reasonable doubt, and that evidence might have made the difference. We therefore remand for a new trial on the charge of second-degree murder.

WILLIAMS, C.J., and BRICKLEY, J., concurred with LEVIN, J.

BOYLE, J. (*dissenting*). The issue in this case is whether serological electrophoresis of evidentiary dried bloodstains[1] has achieved general scientific

---

[63] *Kotteakos v United States,* 328 US 750, 763; 66 S Ct 1239; 90 L Ed 1557 (1946).

[64] *Id.* at 764.

[1] When first the Court considered this case, the issue was the reliability of serological electrophoresis. At the remand hearing conducted pursuant to this Court's order, the defendant conceded that electrophoresis is a reliable and accurate method of determining enzyme and other protein genetic markers in whole blood and blood serum and in laboratory produced dried bloodstains, which has been reliably used for years by geneticists, for paternity testing and in blood banks.

We do not deal here with a question of detection of a mixed stain of blood and semen or semen mixed with saliva, or of semen stains. See *People v Greenwood Brown,* 40 Cal 3d 512; 220 Cal Rptr 637; 709 P2d 440 (1985).

acceptance.[2] As is frequently true, the point at which a court takes up analysis of an issue may mask the real concerns of the law and of individual justices. The question in this case is actually

[2] The reliability of the particular method of electrophroesis, i.e., the multisystem thin gel procedure is not an issue before this Court. First, counsel for defendant, Ronald J. Bretz, whose performance on the record on remand, at oral argument, and in briefing before this Court is commendable both for its advocacy and its integrity, does not suggest to this Court that the issue before us is the reliability of the multisystem technique. Rather, despite the fact that, as both counsel and the trial court recognized, the record on remand went beyond the apparent scope of the remand order, Mr. Bretz, has carefully framed the issue before us as: Whether dried bloodstains from an unknown source which are left at a crime scene and exposed to unknown conditions can be accurately tested using electrophoretic technology.

Second, acceptance of the contention that we must decide on the reliability of the multisystem used in this case results in an application of the test articulated in *Frye v United States,* 54 App DC 46; 293 F 1013 (1923), that would make it necessary for every modification of an already accepted technique to pass the *Frye* hurdle, an issue not argued or briefed here. The question before us is not whether electrophoresis of dried bloodstains using the multisystem is reliable, but, as the trial judge correctly found on remand:

> Whether there [is] any scientific process, by whatever name, that has achieved sufficient scientific reliability and acceptance so as to attempt to accomplish result in a court of law . . . . Is there any process that has sufficient scientific reliability that it should be considered as competent evidence? . . . It appears that is a question that the Supreme Court sent back, using the Young trial in the first instance as a vehicle to determine whether, by whatever name, there is any process that we should be concerned with.
>
> * * *
>
> . . . I am saying at this juncture, as a matter of order of proofs, get to the first question. Is there anything by whatever name that has achieved scientific reliability and acceptance to identify—to link unknown persons with dried bloodstains under forensic circumstances.

The reliability of the particular technique used for the electrophoresis testing of the dried bloodstain in this case is not properly before us, nor is it a question we should be considering. Our only role is to decide whether or not dried evidentiary bloodstains can be reliably typed using an electrophoretic method, not whether it works better on one gel medium than another. Questions as to the technique used by Mr. Stolorow to effectuate the electrophoresis in the *Young* case must be addressed to the trial court.

whether the Court is sufficiently convinced of the reliability of this process that it is willing to trust trial courts and juries to treat application of theory and technique in a particular instance in a manner consistent with procedural fairness and just results. This concern, whether articulated as the *Frye*[3] standard or a different approach to admission of expert opinion, is the motivation for the assertion of an appellate court function when what is proposed to be offered is evidence of a new scientific procedure.[4]

I conclude that the record below establishes that both the theory of electrophoresis and its application to dried evidentiary bloodstains have gained general acceptance in the particular field in which each belongs. *Frye v United States,* 54 US App DC 46; 293 F 1013 (1923).

### THE *FRYE* TEST

The *Frye* standard was first formulated by the United States Court of Appeals for the District of Columbia Circuit in 1923. In a case of first impression, the court found that the polygraph evidence offered by the defendant[5] was inadmissible because the technique had not been sufficiently accepted as

---

[3] *Frye v United States,* n 2 *supra.*

[4] It is clear that, in a system which approaches the admission of expert testimony with a presumption of admissibility, MRE 702/FRE 702, resistance to a novel scientific technique is a paradox based upon a fear that the usual vehicle for evaluating credibility, the fact-finding function, is inadequate to the task. It is further founded on the belief that judges themselves cannot, at the threshold level, deal with the complexities of the evidentiary issue. The test of general acceptance in the scientific community is, in this context, simply a reformulation of the principle that men and women do not ordinarily react to or act upon information in which they do not have confidence. Thus, adoption of a theory and use of a technique are circumstantial indications of the probative value of the evidence.

[5] It is interesting to note that the defendant in *Frye,* although convicted, was subsequently pardoned when another person confessed to the crime.

reliable by the relevant scientific community. In oft-quoted language, the court concluded:

> Just when a scientific principle or discovery crosses the line between the experimental and demonstrable stages is difficult to define. Somewhere in this twilight zone the evidential force of the principle must be recognized, and while the courts will go a long way in admitting expert testimony deduced from a well-recognized scientific principle or discovery, the thing from which the deduction is made must be sufficiently established to have gained general acceptance in the particular field in which it belongs. [*Frye, supra,* p 47.]

Although critics have asserted that in the two-page opinion, the *Frye* court neither cited authority nor offered an explanation for adopting the general acceptance standard[6] and that the standard may have been nothing more than dicta,[7] the *Frye* test was soon accepted in most jurisdictions.

Since its adoption, the criticism of the *Frye* test has often been vehement. As one commentator noted:

> Commentators have not been restrained in their criticism of the *Frye* test. See Moenssens [*Polygraph Test Results Meet Standards for Admissibility as Evidence,* in Legal Admissibility of the Polygraph (Ansby ed, 1975)] at 19 ("archaic"); 22 C Wright & K Graham [Federal Practice & Procedure § 5168] at 87 ("a 'sport' "); Conrad, *Landmarks and Hallmarks in Scientific Evidence,* in Sourcebook in Criminalistics 37, 38 (C Hormachea ed, 1974) ("antiquated on the day of its pronouncement"); Tarlow, *Admissibility of Polygraph Evidence in 1975: An Aid in Determining Credibility*

---

[6] Giannelli, *The admissibility of novel scientific evidence:* Frye v United States, *A half century later,* 80 Colum L R 1197, 1205 (1980).

[7] Costley, *Scientific evidence—Admissibility Fryed to a crisp,* 21 S Tex L J 62, 64 (1980).

*in a Perjury-Plagued System,* 26 Hastings L J 917,
923 & n 38 (1975) ("infamous"). [Giannelli, *The
admissibility of novel scientific evidence:* Frye v
United States, *a half century later,* 80 Colum L R
1197, 1206-1207, n 59 (1980).]

Critics have focused on several problems with
the *Frye* test. Most frequently, comments have
been directed at its excessive restriction on the
admission of relevant evidence, its tendency to fix
standards when the evolution of scientific metho-
dology may well make the standard outmoded in
the future, and the implausibility of assigning
many new scientific methods into well-defined ar-
eas. See Costley, *Scientific evidence—Admissibility
Fryed to a crisp,* 21 S Tex L J 62, 64-65 (1980);
Giannelli, *supra,* 1208-1209.

An additional criticism of the *Frye* test is that
there are no definite criteria to use to decide if
there has been general acceptance. Because it is
impossible to find unanimous agreement in any
field, the courts have been hard-pressed to find the
appropriate number of experts who must have
accepted the technique as reliable. As one com-
mentator noted:

> It would be a mistake for the courts to wait for
> certainty and complete agreement. Neither science
> nor the law functions on such a premise. The
> inconsistencies found in the social world are varied
> and ever changing. In view of this, the courts
> should apply scientific principles while bearing in
> mind the fact that current reality means making
> decisions under uncertain and unstable conditions.
> [Costley, *supra,* p 67.]

See also Strong, *Questions affecting the admissibil-
ity of scientific evidence,* 1970 U Ill L F 1 (1970),
and Giannelli, *supra.*

In response to the criticisms of the *Frye* test,

several courts and at least one federal circuit[8] have either abandoned the test entirely or severely limited its application. In a lead case, the Supreme Judicial Court of Maine ruled that novel scientific evidence would be admissible into evidence when "the testimony to be given is relevant and will assist the trier of fact to understand the evidence or to determine a fact in issue." *State v Williams,* 388 A2d 500, 504 (Me, 1978). See also *United States v Williams,* 583 F2d 1194 (CA 2, 1978), cert den 439 US 1117 (1979); *Whalen v State,* 434 A2d 1346 (Del, 1980), cert den 455 US 910 (1982); *State v Hall,* 297 NW2d 80 (Iowa, 1980), cert den 450 US 927 (1981); *Phillips ex rel Utah Dep't of Social Services v Jackson,* 615 P2d 1228 (Utah, 1980); *State v Catanese,* 368 So 2d 975 (La, 1979); *Watson v State,* 64 Wis 2d 264; 219 NW2d 398 (1974).

Some states and federal circuits, while not specifically rejecting the *Frye* test, have modified it in cases where it would have posed an obstacle to the admissibility of otherwise relevant evidence. In *Coppolino v State,* 223 So 2d 68 (Fla App, 1969), app dis 234 So 2d 120 (Fla, 1969), cert den 399 US 927 (1970), for example, the Florida District Court of Appeals approved the admission of the results of tests formulated specifically for the case (test to detect the presence of succinylcholine chloride in body tissue), while specifically noting that Florida continued to adhere to the *Frye* rule. The record in that case only indicated that the reliability of the test was accepted by the state's witness and not by those presented by the defense.

---

[8] There is considerable controversy in the federal courts as to whether or not *Frye* survived the enactment of the new Federal Rules of Evidence. Although there are no specific statements repudiating the standard, those who believe it did not survive, point to Rule 401 which defines relevant evidence and Rule 402 which mandates that all relevant evidence is admissible, except as otherwise provided by the rules, an Act of Congress, the United States Constitution or by other rules prescribed by the United States Supreme Court.

The Massachusetts Supreme Judicial Court modified the *Frye* Standard in *Commonwealth v Lykus,* 367 Mass 191; 327 NE2d 671 (1975), stating that general acceptance could be shown if it were only among those who would be expected to be familiar with its use. See also *State v Souel,* 53 Ohio St 2d 123; 372 NE2d 1318 (1978); *People v Allweiss,* 48 NY2d 40; 421 NYS2d 341; 396 NE2d 735 (1979); *Ibn-Tamas v United States,* 407 A2d 626 (DC, 1979); *People v LaSumba,* 92 Ill App 3d 621; 414 NE2d 1318 (1980), cert den 454 US 849 (1981); *Ex parte Dolvin,* 391 So 2d 677 (Ala, 1980); *United States v Baller,* 519 F2d 463 (CA 4, 1975), cert den 423 US 1019 (1975); *United States v Franks,* 511 F2d 25 (CA 6, 1975).

The continuing debate over the proper approach to novel scientific evidence is generated by the tension between a reluctant approach to novel evidence which may carry great weight for the factfinder and the principle that evidence which may be of value to the factfinder should be precluded only when necessary to carry out the dictates of a conflicting and overriding policy. I do not advocate that this Court abandon the *Frye* test. I would, however, reject the requirement that the reliability of novel scientific evidence must be established by disinterested witnesses, *People v Barbara,* 400 Mich 352; 255 NW2d 171 (1977), and *People v Tobey,* 401 Mich 141; 257 NW2d 537 (1977), that is, those whose livelihood is not "intimately connected with the new technique." While it may be appropriate for the Court to use *Frye* for its intended purpose, I do not see a basis for the expansion of the rule in a direction which erects insurmountable obstacles to forensic evidence and thus needlessly impedes the admission of probative evidence. Such a rule establishes a "Catch 22" approach to admissibility in the face of a national

trend toward a more liberal approach to the admissibility standard.[9]

Contrary to the contention that the approach of the majority is not a modification of *People v Barbara* and *People v Tobey,* neither case can be read as standing for the proposition that a foundation must be established by disinterested *scientists,* or that while "a certain degree of 'interest' must be tolerated," *ante* at 483, the testimony of a *scientist* whose livelihood is intimately connected with the new technique must be disregarded. Rather, in *Barbara,* the Court specifically noted that the credentials of the witnesses, "although outstanding for polygraph technicians, are not those of scientists." *Id.,* p 377. The Court also noted "[u]nder the present state of the art the general acceptance of the polygraph among psychologists and physiologists cannot be demonstrated, because such acceptance does not exist." *Id.,* p 390. While the Court stated that "one would want, where the task was to demonstrate general scientific acceptability, an acknowledgment of the value of the device and the techniques by disinterested scientists whose livelihood was not intimately connected with it," *id.,* p 376, *Barbara* did

---

[9] See, *e.g.,* Trautman, *Logical or legal relevancy—A conflict in theory,* 5 Van L R 385 (1952); Boyce, *Judicial recognition of scientific evidence in criminal cases,* 8 Utah L R 313 (1963); Strong, *supra;* Giannelli, *supra;* Costley, *supra;* McCormick, *Scientific evidence: Defining a new approach to admissibility,* 67 Iowa L R 879 (1982).

Perhaps most well known for his criticism of the *Frye* test is Dean McCormick. In his text on evidence he notes:

General scientific acceptance is a proper condition for taking judicial notice of scientific facts, but it is not a suitable criterion for the admissibility of scientific evidence. Any relevant conclusions supported by a qualified expert witness should be received unless there are distinct reasons for exclusion. These reasons are the familiar ones of prejudicing or misleading the jury or consuming undue amounts of time. [McCormick, Evidence (3d ed), § 203, p 608.]

not stand for the proposition that the *Frye* standard could only be met by disinterested scientists.

Nonetheless, the Court in *Tobey, supra,* p 145, cited the rule of *Barbara* as follows: "[G]eneral scientific recognition may not be established without the testimony of . . . 'disinterested scientists whose livelihood was not intimately connected with' the new technique." The Court in *Tobey* then applied the rule to the testimony of a police officer "but not a scientist" and to the testimony of a professor of audiology and noted that "[n]either Nash nor Tosi, whose reputations and careers have been built on their voiceprint work, can be said to be impartial or disinterested."[10] *Id.,* p 146.

I do not quarrel with the Court's conclusion in either *Tobey* or *Barbara* that the record was insufficient to establish general acceptance in the relevant scientific community. What I do take issue with is the majority's conversion of the rationale of *Barbara* into a rule requiring the disqualification of the testimony of witnesses who indisputably have education, formal training, and background in the applicable scientific disciplines.

That a court may weigh the credentials and self-interest of a witness in determining whether a sufficient showing of reliability has been made is self-evident; it does not logically follow, as the majority suggests, that a witness' self-interest compels this result.[11]

---

[10] Pennsylvania and California have held that the testimony of a single witness, whose career has been "built . . . on the reliability of the technique," *People v Kelly,* 17 Cal 3d 24, 38; 130 Cal Rptr 144; 549 P2d 1240 (1976), and who was *not* a scientist, was insufficient to establish the reliability of a new technique, *Commonwealth v Topa,* 471 Pa 223, 231; 369 A2d 1277 (1977). See also *People v Brown,* 40 Cal 3d 512; 220 Cal Rptr 637; 709 P2d 440 (1985) (forensic technicians identified with law enforcement, with career interest in acceptance of tests and lack of formal training and background in the applicable scientific field not qualified to state the view of the relevant community of impartial scientists).

[11] Nor does it follow that scientific community approval is absent

A trial or appellate court could comfortably conclude that the testimony of technicians is insufficient to establish reliability. There is, however, simply no basis for placing wholesale the "disinterested expert/intimately connected" gloss on the *Frye* test. Indeed, as the trial court noted, the effect of such a test diminishes, as a matter of law, the testimony of Mark Stolorow, who is not a technician, but the holder of a bachelor of science degree and a master's degree in forensic chemistry, is a codeveloper of the technique, and who has been working with it and teaching it since 1975. It also diminishes the testimony of James Kearney of the serology unit of the FBI who holds a bachelor of science degree in bacteriology and a master's degree in microbiology, and who also has worked with and taught the procedure of electrophoresis of evidentiary dried bloodstains since 1978 (in a laboratory that does 8500 electrophoretic examinations a month, ninety percent of which are done by the multisystem).

The instant record is a paradigm of the problems created by such an approach. The testimony of those who have the most knowledge in the field, the forensic scientists, is regarded as suspect. The testimony of Drs. Sensabaugh, Grunbaum,[12] and Juricek, all of whom may be said to have an advocacy interest in the issue, is accorded greater weight. The witnesses who have no financial interest in forensic phenotyping and no actual experi-

where those who have developed the technique and whose reputation and livelihood depend on use of the new technique alone certify the validity of the technique. Situations can certainly be hypothesized where the background, education, experience and reputation of one individual would be such as to persuade the appellate court of that individual's qualifications to express an opinion on the question of general scientific acceptance.

[12] Dr. Grunbaum has, according to the reply brief in *People v Brown, supra,* invented a machine for PGM typing and receives a percentage.

ence in the process are accorded the most defer-
ence in this variation of the *Frye/Tobey/Barbara*
analysis. The result is that those scientists who
know the most about the process are viewed, as a
matter of law, as the least persuasive witnesses.
The "livelihood . . . intimately connected with the
new technique" test represents a regressive ap-
proach to scientific developments which, paren-
thetically, would have devalued the opinions of
Jonas Salk, Albert Einstein, or Marie Curie, each
of whose life work, livelihood, and standing in
their professional community was intimately con-
nected with a new scientific procedure.

### THE THEORY OF ELECTROPHORESIS

Electrophoresis is the movement of charged par-
ticles through a buffered conducting medium by
application of a direct current. The term isozyme
is used to describe enzymically active blood pro-
teins which can be identified by their relative
mobilities in an electric field. After separation of
the proteins into marker bands by application of a
current, specific chemicals are applied to make the
proteins visible. *Biology Methods Manual,* Metro-
politan Police Forensic Science Laboratory, Lon-
don, England (1978). The relative distance of the
bands from a common origin is compared with
known standards, and evaluated by established
guidelines.

The results are then compared to population
studies which show the known frequency of each
factor in a given population. This produces a sta-
tistic which is representative of the percentage of
the population that has that group and those
factors in common.[13] The more genetic markers

---

[13] The samples in this case, upon which the prosecution's witness
offered his opinion, had previously been determined to be type o, in

identified, the smaller the population of persons who might possess a particular combination of factors.

### APPLICATION OF THE THEORY TO EVIDENTIARY BLOODSTAINS

It is undisputed on this record that the theory of electrophoresis is generally accepted as reliable in the scientific community. Indeed all witnesses at the hearing on remand so testified.

There is ample basis in the record, even apart from defendant's concession, that the theory of serological electrophoresis, and the application of the theory to laboratory-produced dried blood samples, has achieved general scientific acceptance as a reliable identification technique.[14] Dr. Grunbaum testified at trial to these conclusions and also acknowledged that proficiency tests established that, as to evidentiary materials, "there are many competent analysts in the country that can do it [electrophoresis on evidentiary bloodstains] with a great deal of confidence."

the ABO system, a type occurring in forty-five percent of the population.

[14] My colleague's reliance on Jonakait's article, *Will blood tell?*, 31 Emory L J 833, 851 (1982), is problematic, given the fact that Professor Jonakait is a lawyer, not a scientist [see *People v Shirley*, 31 Cal 3d 18; 181 Cal Rptr 243; 641 P2d 775 (1982)], and that he describes his initial "problem" as a concern that "[t]he forensic scientist stands alone in the attempt to classify genetic markers in dried blood . . . ." He further claims that "[t]he geneticist . . . does not have an interest in classifying genetic markers in dried blood. Instead [the geneticist,] like the blood bank, works with fresh or preserved liquid blood." This observation by Professor Jonakait is directly contrary to the testimony of Dr. Rachael A. Fisher, who holds a Ph.D. in Biochemical Genetics from the University of London. Dr. Fisher testified that she routinely tests dried stains in her research on inherited diseases. It is also contrary to the testimony of Dale Dykes of the Minneapolis War Memorial Blood Bank who stated that, in acting as a referral agency for laboratories in other countries who are comparing their own genetic variants, their laboratory finds it more suitable if dried blood is sent to them for analysis.

In general, fewer marker systems are usable in stain analysis than in fresh materials. There are in excess of seventy-five markers in human blood, approximately a dozen of which are amenable to stain analysis. Whether a genetic marker can be typed in a stain depends on whether it persists in recognizable form in the stain material. This inquiry has required a determination of the life expectancy of particular markers in samples exposed to air and other possible contaminants. If the marker persists, then methods which produce reliable results with fresh blood will also give reliable results with stain material, Denault, *Detectability of selected genetic markers in dried blood on aging,* 25 J Forensic Sciences 479 (1980), provided the samples are carefully prepared and interpreted, Grunbaum, "Procedures for Phenotyping of Genetically Controlled Enzyme and Protein Systems," *Handbook for Forensic Individualization of Human Blood and Bloodstains* (1981).

The record establishes that the five genetic markers tested for in this case (EAP, ESD, GLO, PGM, and HP) persist in dried stains and that it is a common practice, accepted in both this country and the international scientific community, to transmit dried stains, on paper or cloth by mail. The testimony also revealed that these stains remain readable through the use of accepted protocols. See also Denault *supra;* Gaensslen, *Sourcebook in Forensic Serology, Immunology, and Biochemistry,* National Institute of Justice (1983). Gaensslen, *supra,* pp 431-432, reports fourteen studies on the survival of PGM enzymes in dried bloodstains and notes that all the samples could be correctly typed up to thirty-two days. Denault's study reports the detectability of EAP, PGM, Ak, and ADA. The markers in all samples were unknowns to the investigators. Denault, *supra.* See also testi-

mony of Dr. Rachael Fisher, Michigan State University, and Dr. Harvey Mohrenweiser, University of Michigan, Department of Human Genetics. The literature also reports that in 1976 Wraxall and Eames reported a starch gel method for electrophoretic typing of EAP in stains and that "blind trial studies" indicated that the procedure was completely reliable. Gaensslen, *supra,* p 451. Dr. Rachael Fisher also testified that alterations from drying were not seen in PGM or EAD and that the effect of aging on ADA and EAP could be reversed by Cleland's reagent.

Thus, while it is true that blood degrades rapidly while drying, the literature and the record establish that markers which undergo alteration during drying are rejected for forensic use and that the markers in question in this case may be reliably identified by electrophoresis. Sensabaugh, *Uses of polymorphic red cell enzymes in forensic science,* 10 Clinics in Haematology 185 (1981).

The results of a Law Enforcement Assistance Administration study of dried stains were not published, but the study, conducted by Brian Wraxall, is available in the National Criminal Justice Reference Service and the findings have been circulated to, and adopted by, a sizeable number of forensic laboratories. Thus, both the theory and its application to stains have been put into practice and relied upon for an extended period of time. Wraxall, *Final Report, Bloodstain Analysis System,* United States Department of Justice, 1978.

The literature and the record in this case indicate a continual effort to monitor results and to further reduce the possibility of error in electrophoresis of dried bloodstains. As a result of this effort, scientists and technicians are now well aware of procedures and indicators unique to dried bloodstain analysis, and genetic markers which undergo changes which will affect the typing re-

sults are rejected for use by forensic scientists (and by geneticists for population studies).

Also, the forensic process itself includes the systematic evaluation of the stability of markers stored under various known conditions such as aging, humidity, chemicals, heating, and freezing. If the typing of a marker substrata system cannot be made reliable, then it is discarded. Sensabaugh, *supra,* p 198.

Because the principal effect of bacteria is on wet blood, contamination in a dried stain will signal itself as untypeable or will result in different band patterns. These patterns are evaluated by guidelines set forth in the literature. *Biology Methods Manual, supra,* pp 2-88 to 2-138. Bacteria, thus, manifests itself as a problem which is different from those normally seen and not comparable to the control marker. Forensic and nonforensic scientists routinely analyze air dried samples which have been contaminated by bacteria. One example of this process is illustrated by the method in which difficulties in the EAP system have been addressed. See Williams & Shah, "Enzyme Patterns in Bacterial Classification and Identification," *Microbiological Classification and Identification,* 1980, pp 299-318. The EAP system is based on a genetic explanation of six phenotypes called A, BA, B, CA, CB, and C. The differences between these phenotypes on electrophoretic plates are a matter of band intensity. Misinterpretation of phenotypes is possible if these effects are not fully appreciated. The methodology, therefore, dictates the inclusion of appropriate controls of known phenotypes when using any phenotypic procedure, and particularly when attempting to diagnose B, CB, and C phenotypes. Gaensslen, *supra,* p 452.

Finally, and most significantly, the record indicates that the consequence of virtually all typing errors is a false exclusion. If one typing error is

made on a true person, that person is excluded.[15]
The possibility of false inclusion is more remote.[16]

As the trial court correctly observed, the reliability of the particular sample in a given analysis is a distinct question from the reliability of the theory or the technique. The claim that the possibility of contaminants in a crime scene sample precludes a conclusion of the reliability of the technique or the theory of electrophoresis, is in reality a claim that there can never be a reliable forensic opinion,[17] since as Dr. Grunbaum noted, the range of potential contaminants "goes on beyond anybody's imagination." While it is true that specimens may be contaminated with impurities, the literature indicates that different conditions of exposure cause variation in the persistence of typeable markers and that those markers that persist can be reliably identified. Although, as the majority notes, Dr. Juricek has testified and written that Type 2 PGM may contaminate Type 1 blood and lead to a Type 1 PGM being identified as

---

[15] Assuming, as in this case, five markers with three possible types, Sensabaugh testified as follows:

I think it is important to have a sense of the large number. Three to the third is 27, three to the fourth is 81, three to the fifth is 243 . . . . In any case, those are all possible outcomes of the typing tests, some very large number. You end up with one outcome. If the person is the true source and you make a mistake on the typing, then you have excluded that person . . . .

[16] The possibility of a false inclusion is very much less than the possibility of a false exclusion, and that is because you would have to have one by chance, one of the . . . two hundred and forty possible types would have to match the false result that you got.

[17] This appears to be the basis for Jonakait's claim that the *Frye* test is inadequate to guarantee reliability of the genetic tests since, in Jonakait's view, these procedures are only used in the forensic lab and general acceptance in the field cannot and will not be possible.

a Type 2-1, the literature indicates that the only false positives that have been reported for PGM are in whole blood samples. Gaensslen, *supra,* p 433.

The effects of heating, humidity, aging, metals, chemicals, air born bacteria, and substrata have been investigated for the markers in question in this case. Culliford, *The Examination and Typing of Bloodstains in the Crime Laboratory,* Department of Justice, 1971, pp 108, 117, 120; Denault, *supra; Biology Methods Manual, supra,* pp 2-88 to 2-138. The application of electrophoresis to evidentiary dried bloodstains is generally accepted in the relevant scientific community and is reliable.

### DISTINCTION BETWEEN RELIABILITY OF THEORY AND TECHNIQUE AND THE EVALUATION OF EXPERT OPINION PROFFERED IN A PARTICULAR CASE

If there is a question regarding the sample offered as the basis for the opinion in this case with regard to potential error in age of the marker, the fabric from which it was obtained, the particular test used or other factors going to the foundation of the expert opinion, these are factors to be evaluated by the trial court in its traditional function of determining admissibility, MRE 103, 104. If the test results are determined preliminarily to be admissible, facts affecting the weight and credibility of the opinion may, of course, be placed before the factfinder.

The effect of crime scene contaminants on a particular sample is a question that relates to the trial court's duty to determine, as a preliminary issue of admissibility, whether the expert opinion offered in a given case with regard to a particular sample has a sufficient foundation to be relevant.[18] If the testimony is admitted, questions concerning

[18] I note that what we are not presented with in this case is a

the reliability of the sample and the test employed are explored through cross-examination and go to the weight and credibility of the opinion.[19]

Because both the theory of electrophoresis and its application to evidentiary bloodstains are generally accepted in the relevant scientific community, I conclude that the testimony was properly admitted below.

### THE MULTISYSTEM TECHNIQUE

While the issue of the particular technique used in this case was not within the scope of the remand order, and is not a proper subject for review by this Court, the majority deals extensively with the multisystem method as if that were the technique in question. Indeed, the observation in the majority opinion, p 491, that "[b]ecause the results of the GLO test were not interpretable in the instant case, the only issue is the reliability of the PGM results in the multisystem analysis," highlights the fact that this is a question that goes to the discrete issue of admissibility and credibility of the opinion offered in this case.

It may, however, be noted that combination analysis, or a system that analyzes more than one enzyme at a time, is routinely used and accepted as reliable in the scientific community. The testi-

situation where the test results and photographs of the test itself are not available. In this case, photographs were taken and test results were recorded. Sensabaugh, *supra,* p 202, opines that every effort should be made to maintain the sample in a scientific test in order to ensure admissibility. The proposed new Michigan Rules of Criminal Procedure on discovery would make available to the defendant the results of any scientific testing done by the prosecution. Proposed MCR 6.202

[19] The fact for example that the Denault study indicated four false positives for the antigens A and B at twenty-six weeks is not a reason for rejection of the theory of electrophoretic typing of evidentiary bloodstains. Rather, the Denault work is a basis for a challenge to an opinion about the reliability of testing on a comparable sample.

mony reveals that a combination method for the three markers tested simultaneously in this case, PGM, ESD, and GLO, is used in genetic research in the Departments of Pediatrics and Pathology at Michigan State University. A combination method involving two sequential markers on the same gel is also in use at the University of Michigan Medical School, and a combination method was used for three years at the Minneapolis Blood Bank.[20] The literature establishes that there are a wide variety of multiple systems used to determine polymorphic enzymes on the same electrophoretic run and that these procedures are used by forensic and nonforensic scientists. See *Gaensslen, supra,* p 432.

The particular multisystem method used in this case has been used by the FBI since 1979, is in use in more than one hundred crime laboratories in the country, and is taught to and used by students as a protocol at the University of California in Berkeley. It is also used for fresh blood testing in an independent laboratory available to any seeker of its services.

This method was tested by blind trial tests conducted in four separate laboratories. *Final Report, supra.* While the results were returned to and tabulated by Beckham Laboratories, to which Brian Wraxall was then under contract, it is not correct to suggest that this was not an independent study or that these tests were self-verifying. These blind trials were not "conducted" by Mr. Wraxall. Rather, five batches of six bloodstains, each of various ages, were sent to serologists in

---

[20] It also appears that the data, created from the occurrence of genetic markers in a population study conducted by Mark Stolorow, was determined to be reliable and is in fact relied upon at the University of Michigan School of Medicine. Further, the percentage frequency of genetic markers for these systems was independently and repeatedly confirmed by an independent laboratory and incorporated in a published report of the American Association of Blood Banks.

their own labs, for typing of eight genetic markers. Thus, while it appears that the examiners knew what they were looking for, the tests were blind in the sense that the examiners did not know the identity of the markers in the particular sample.[21] Of a total of 912 readings, only one reading was incorrect. Wraxall, p B-7.[22]

[21] My colleagues' conclusion with regard to the Wraxall tests (*ante,* p 492) is perplexing in light of the fact that the Denault study, relied on by the majority, clearly defines the term "blind trial" as a test in which the investigator has no knowledge of the identity of the tested samples. Denault, *supra,* p 485.

The whole purpose of the test, then, is to achieve results without the experimenter knowing beforehand what those results should be. Clearly, a blind trial, if conducted properly and absent fraudulent practices not in evidence in the Wraxall test, precludes manipulation whether performed by Denault or Wraxall.

While this testing, if taken alone, may not be adequate evidence to prove the reliability of the system, I question the conclusion that blind tests initiated but not performed by those who developed a system are unreliable per se.

[22] The majority claims that the findings of a panel convened to review Dr. Grunbaum's criticisms of Wraxall's study were not entered into evidence and that the prosecution and defense disagree about what the panel concluded. In fact, the panel findings were entered into evidence as People's Exhibit 3 along with a letter from the Associate Director for Service and Technology for the LEAA which stated that "no evidence was found to substantiate Dr. Grunbaum's allegations . . . ." Discussion of the report at trial between the prosecution and Dr. Grunbaum details the gravamen of the "controversy" alleged by the majority.

Q. Are you familiar with a letter written to Mr. J. L. Morgan on September 11, 1979, as Senior Contract Administrator, Beckman Instruments, in which Mr. Morgan was advised that the review group examining the allegations made by yourself, they found no evidence or—excuse me—no evidence was found to substantiate Dr. Grunbaum's allegations, although a number of minor discrepancies were noted; are you familiar with that letter?

A. I am familiar with that letter, yes, and I said that Mr. Kochanski did not tell the truth, because I have another letter from counsel of LEAA that says just the opposite.

Q. Mr. Kochanski, who is the Associate Director for Service and Technology, Office of Research Programs, U.S. Department of Justice was not telling the truth?

A. That is correct.

*   *   *

Subsequent blind trial proficiency tests for laboratories using the multisystem and those using other systems were conducted by the Forensic Science Foundation from 1979 to 1983. The sum total error rate on individual marker analyses was 1.6 percent of 3107 total tests per protocol.[23]

I also disagree with my colleagues' evaluation of Dr. Rachael Fisher's testimony with regard to the multisystem. Dr. Fisher was qualified as an expert and is on staff at Michigan State University in the Departments of Pediatrics and Pathology. She testified that she had run the enzymes in hundreds of different systems in her research on inherited diseases, had read the manual for the multisystem, and offered her opinion that the system incorporated all the features that "are necessary to make it work." She further stated that the protocols for EAD, PGM, GLO, EAP, and HP are recognized and, in reply to the specific question, "If you had a dried bloodstain or a limited supply of blood, could you use a thin gel method and develop all three on that one thin gel?", she answered, "yes, one could be done certainly."

In any event if, as Dr. Grunbaum opined, there was a misapplication of the particular technique in the *Young* case, in my judgment this is an issue to be resolved by the trial court. As the Ninth Circuit noted in *United States v Gwaltney,* 790 F2d 1378, 1382 (CA 9, 1986):

---

*Q.* Doesn't it [the panel report], in fact, say that, "Although it is preferable to avoid personality conflicts, a consideration of that subject cannot be avoided in this case because it is the crux of the problem"?

*A.* This is what it says, but this is not the truth.

*Q.* This is the panel's own report, is it not?

*A.* Unfortunately, they injected that.

---

[23] Since one marker exclusion between a stain and a blood sample being compared will exclude the donor as the contributor of the stain, the error rate per marker, not per stain, is the indicator of the system's reliability.

To the extent Gwaltney complains of the application of the procedure in this instance, he does so in the wrong forum. Criticism of the application of a valid test in a particular instance bears on weight, not admissibility.

I would affirm.

Riley, J., concurred with Boyle, J.