STATE of Minnesota, Respondent,

v.

Michael W. FENNEY, Appellant.

Nos. C5–87–1393, C3–89–1011.

Supreme Court of Minnesota.

Nov. 3, 1989.

C. Paul Jones, State Public Defender, Elizabeth B. Davies, Asst. State Public Defender, Minneapolis, for appellant.

Hubert H. Humphrey, III, Atty. Gen., Paul R. Kempainen, Asst. Atty. Gen., St. Paul, for respondent.

KEITH, Justice.

Defendant Michael Fenney appeals his convictions of first and second degree murder. Minn.Stat. §§ 609.185(2), 609.19(1) and (2) (1988). He was sentenced to life imprisonment on the charge of first degree murder and is presently serving his sentence in the Minnesota Correctional Facility at St. Cloud. On appeal, he claims reversible error in the post conviction hearing on the grounds that newly discovered evidence was material and would probably produce a more favorable verdict on retrial. He also claims reversible error because of (1) admission of (a) electrophoresis results, (b) mention of polygraph testing, and (c) one-

man photograph identification, (2) denial of cross examination on collateral matters that might implicate a third party in the crime, and (3) insufficient evidence. We affirm.

Mona Armendariz was murdered in her trailer home in Janesville, Minnesota during the early morning hours of July 29, 1986. Authorities found her body that day shortly after 11:00 a.m. Her body was naked from the waist down, her T-shirt was torn and pushed up over her breasts, and a curling iron was inserted in her vagina. She had been beaten and stabbed. She died from a slit throat.

Defendant Michael Fenney had connections in Janesville. He had lived there for over a year in 1983–1984 with foster parents and made friends in the community. After Fenney left his foster home, he occasionally returned to Janesville and visited a friend, Gordon Abbe, in his trailer home.

The evening before Armendariz's murder, Fenney visited her. He had arrived in Janesville that day, July 28, 1986 on his way South to look for work. He had planned to spend the night with his friend, Gordon Abbe, but when Abbe said he would have to be in by 10:00–10:30 p.m., Fenney decided to stay at Armendariz's instead. He would just leave his backpack at Abbe's. Whether the backpack was at Abbe's trailer all night or at Armendariz's, where Fenney says he placed it when he first visited her, is disputed. Fenney denies saying he would stay with Armendariz and denies that he placed his backpack in the Abbe trailer.

Fenney spent the evening until about 9:30 p.m. drinking beer with Armendariz. At that time he bicycled to downtown Janesville, because they needed more beer before the liquor store closed. While in town, he visited with acquaintances and his foster parents, drank some beer, then left for the Armendariz trailer around 11:00–11:30 p.m. Testimony from one witness places Fenney in the Armendariz trailer around 12:30 a.m. Fenney testified it was at 11:30 p.m. and that he only stayed five minutes to give Armendariz the remaining beer, then left to see a friend in town.

No other witness testified as to whether he remained in the trailer or was seen heading back to town. The first positive testimony as to his whereabouts later was given by Abbe and a co-worker who spent the night in his trailer. Both testified seeing Fenney enter the Abbe trailer about 2:30–3:00 a.m. Both also testified that Fenney explained his lateness by saying Armendariz kicked him out, but Fenney refutes the statement.

In addition to Fenney, Steven Sack, who had been living at the Abbe trailer, was in the trailer park in the middle of the night. He attempted to enter Abbe's trailer through a window around 1:00–1:30 a.m. because the door was locked. Abbe woke up and told him to leave. Sack left with his dufflebag and a buck knife which had a blade about six inches long and one and one-half inches wide.

Sack testified that while he stood on the trailer hitch just prior to entering Abbe's trailer, someone called to him, but he neither spoke to him nor recognized him. After leaving the trailer, Sack met no one, but heard angry voices.

Fenney, in uncorroborated testimony, described his own actions at that time as follows: He stated that when he returned from trying to see the friend of his in Janesville, he called to someone he saw on the trailer hitch of the Abbe trailer, then went up to the man whom he did not recognize. The stranger said something about going to the Armendariz trailer, because Armendariz owed him money. That reminded him of his backpack left at Armendariz's, so he walked with the man to the trailer, but asked the man to retrieve his backpack for him as he did not want to be involved in their argument. In spite of close proximity to the man, he could not describe him. While waiting outside, he heard various thumps and bumps inside, but no screams. He did not investigate. The man came out without the backpack and said, "You'll not like what you see, go get your backpack yourself." He did so and left. He made no attempt to find out what happened. He concluded his story by

stating that he then went to the Abbe trailer to sleep.

Fenney left early the next morning to continue south to look for work, although people with whom Fenney had spoken the previous day thought he was going to look for work in Janesville.

Later in the morning on July 29th, Sheriff Kubat found Armendariz's body under a bed in her trailer home. Fenney was arrested in Iowa the following day, July 30, 1986. Upon learning that he was wanted for murder, Fenney asked the trooper "[w]hat time of night he was supposed to have done it," even though nothing indicated to him that the murder occurred at night.

Later that evening, Fenney gave a statement to Agent Luttring. He claimed that he had come back from town with some beer and stopped at the Armendariz trailer, but when she did not answer he went on to the Abbe trailer to spend the night and did not see her again. Upon learning that Abbe had stated that Fenney had not entered the Abbe trailer until after 2:30 a.m., Fenney changed his story to say he sat on Abbe's car awhile before entering. He claimed further that he had seen someone climb into the Abbe trailer and that he said something to the person, but he gave no testimony that he accompanied this person to the Armendariz trailer to retrieve his pack.

At trial, Fenney contradicted the statements he had made to Agent Luttring. Instead, he admitted seeing Armendariz after 9:30 when he gave her the beer he had bought in town and he described his meeting with the unidentified man who had entered the trailer.

The Minnesota Bureau of Criminal Apprehension's (BCA) investigation of the crime scene led to discovery of Fenney's fingerprint(s) on two beer cans, one can of which was still on the table and could have been the same as those he had purchased in town. Prints of a pair of shoes seized from Fenney when he was arrested matched bloody footprints taken from the crime scene, although no blood appeared on the shoe soles. Clothes found in Fenney's pack had blood stains on them. Using electrophoresis, the BCA conducted blood sample tests on the stains from the clothes, on stains at the scene, and on liquid blood samples taken from Armendariz and Fenney. Blood samples from the scene were consistent with Armendariz's blood. Blood stains on Fenney's clothing were also consistent with Armendariz's blood, but inconsistent with Fenney's.

Evidence from the autopsy showed the condition of the body was consistent with death occurring between 1:00–3:00 a.m. The stab wounds were consistent with a knife blade approximately 1 and ½ inches long and one-half inch wide.

After deliberating for a day, the jury found Fenney guilty.

After filing his notice of appeal, defendant requested and obtained a remand in order to petition for post conviction relief based on a claim of newly discovered evidence. The trial court denied the petition.

1. Defendant claims error in admission of evidence linking blood stains on Fenney's clothing with Armendariz's blood. Defendant claims the evidence was inadmissible, because the electrophoretic process used to type the dried blood does not pass the *Mack/Frye* standard for admission of scientific evidence.

■ Admissibility of electrophoresis evidence depends on its general acceptance by the relevant scientific community as reliable. Minnesota has adopted the *Frye* rule, which requires that " 'the thing from which the [expert testimony] deduction is made must be sufficiently established to have gained general acceptance in the particular field in which it belongs.' " *State v. Mack*, 292 N.W.2d 764, 767 (Minn.1980) (quoting *Frye v. United States*, 293 F. 1013, 1014 (D.C.Cir.1923)). Under the rule, "the results of mechanical or scientific testing are not admissible unless the testing has developed or improved to the point where experts in the field *widely share* the view that the results are scientifically reliable as accurate." *Id.* at 768 (emphasis added). We stated the rule more succinctly in *State v. Anderson*, 379 N.W.2d 70

(Minn.1985) as: "The scientific technique on which expert testimony is based must be scientifically reliable and broadly accepted *in its field." Id.* at 79 (emphasis added). The test, then, requires neither unanimity nor acceptance outside its particular field.

The trial court in *Fenney* held a mid-trial *Frye* hearing on the issue. The hearing record included, by stipulation, the transcripts and exhibits from the pretrial evidentiary hearing in *State v. Joon Kyu Kim,* 398 N.W.2d 544 (Minn.1987). On the basis of the record and his findings, the trial judge ruled serum electrophoresis evidence admissible, because the electrophoresis process is accepted as reliable by the relevant scientific community consisting of criminal analysts and War Memorial Blood Bank personnel and the test was correctly performed.

The question of whether electrophoretic testing of dried bloodstains meets the *Mack/Frye* rule is one of first impression for this Court.[1] We review the issue de novo as it presents a question of law. *Jadwin v. Minneapolis Star and Tribune Co.,* 367 N.W.2d 476, 483 (Minn.1985), *appealed on other grounds,* 390 N.W.2d 437 ((Minn. App.1986). To make a determination, we must consider development of the use of electrophoresis, the process itself, and its acceptance and reliability within the relevant community.

*Forensic use of electrophoresis*

Electrophoresis is a process of separating charged molecules. As early as 1937, it was used to separate mixtures of proteins. Note, *The Admissibility of Electrophoretic Methods of Genetic Marker Bloodstain Typing Under the* Frye *Standard,* 11 Okla. City U.L.Rev. 773, 782 n. 59 (1986) (hereinafter referred to as "Note"). In 1965, electrophoretic marker typing was introduced to the forensic science community by the Metropolitan Police Laboratory in London, England. Note at 775 n. 7. The

Minnesota Bureau of Criminal Apprehension Laboratories ("BCA") began using electrophoresis in 1971. In particular, it began with the genetic markers PGM and EAP. In 1978, the BCA evaluated the multi-system method of electrophoretic typing and concluded it was reliable and reproducible and could be applied to casework. As of 1981, over 100 crime laboratories throughout the United States and Canada used electrophoresis. *State v. Washington,* 229 Kan. 47, 52, 622 P.2d 986, 990–91 (1981).

*The Electrophoretic Procedure*

Serum electrophoresis is a process that separates blood into its component proteins and enzymes[2] by the use of an electric current. A portion of the blood sample is placed on a gelatin-like substance that is mounted on a glass plate. Known blood samples are placed beside the unknown sample. An electric current is passed for a period of time through the samples and gel. The blood proteins assume positive, negative or neutral charges, then move toward the pole of the opposite charge. Because the proteins vary in size, shape, density and charge, they vary in mobility. Thus, they migrate in the electrical field at different speeds and stop migrating at different specific points. The result is that the particular proteins and enzymes are separated into banding patterns. Each banding pattern is distinctive for a particular protein/enzyme. After separation, chemical dyes are applied that react with the proteins/enzymes to make them visible to either the eye or under ultraviolet light. The patterns are then read by a trained analyst and the proteins/enzymes are typed.

At the BCA, any necessary control is provided by having another analyst read the results and make an independent determination. A photographic record of the banding is not usually made. If the forensic sample is completely used up in the

---

**1.** This Court did implicitly accept the reliability of electrophoresis, however, in dicta in *State v. Joon Kyu Kim,* 398 N.W.2d 544, 547, 549 (Minn. 1987) (in a case of criminal sexual misconduct, holding inadmissible opinion testimony as to the probability that semen was the defendant's, but noting in dicta that testimony as to the basic

theory underlying [electrophoretic] blood testing was admissible).

**2.** Most enzymes are a specific type of protein that act as a catalyst. Most forensic work deals with enzymes.

testing procedure, which may occur with small sample sizes, no retesting will be possible on that particular sample.

Two types of testing are done. One type is to test for several proteins at once using a method called the "multi-system" method. The other type tests for only one protein at a time. Use of the multi-system on PGM can compromise results, not in the sense of mistyping, but in the sense of causing inconclusive results, because the dye paper used to stain a particular protein can soak up PGM molecules.

*Areas of Concern*

Three major areas of concern exist when dealing with electrophoresis of forensic blood stains. One is the problem of contamination. Contamination of the blood sample may occur from substances such as dirt, gasoline, sweat and the like. For protein/enzyme typing, the problem of contamination is dealt with by the experience of the analyst in recognizing banding patterns. Internal variations in the banding pattern of a particular protein indicate to the analyst whether the pattern is being altered by contamination. When contamination is noted, a typing determination is not made and the result is classified as indeterminate.

A second area of concern is deterioration of the proteins as a blood sample ages. The proteins and enzymes lose their activity with age, but there is no conversion in form from one protein/enzyme to another. Therefore, there is no problem that a protein will be mistyped. Rather the banding pattern becomes so faint as to be unreadable. When the pattern becomes too faint, the result is classified as indeterminate.

The final area of concern is the fact that the sample is dried blood rather than liquid blood. Dried blood samples, however, have been determined to be more reliable than liquid samples, because they remain stable over longer periods of time.

*Determination of reliability*

In general, " '[t]he reliability of the methods and techniques used for typing and determination of genetic markers in blood and body fluid stains has been well established by appropriate and properly controlled scientific investigations.' " *Note* at 784 (quoting Report of the American Academy of Forensic Sciences, Ad Hoc Committee on Genetic Marker Typing 3 (March 23, 1984)). Those basic methods are not at issue. Rather, it is the effect of environmental factors on typing results that poses the problem. Before addressing that problem, however, we must consider the initial question of what constitutes the "particular field" within which the scientific technique must be widely accepted as reliable. According to testimony, electrophoretic testing of dried bloodstains is used mainly in connection with forensics. Taking forensics as the relevant field, then, those actually involved with electrophoretic typing of dried bloodstains constitute the experts who must widely share the view that the results are reliable.

Turning to the record made at trial, the State offered testimony of six witnesses who worked in forensic laboratories or engaged in forensic teaching, research, and analysis and who had had experience with electrophoresis on dried bloodstains. They testified not only with respect to their own opinions, but also with respect to acceptance by others in the field. The one witness presented by the defense had never done electrophoresis on dried bloodstains. Arguably, the defense witness was not an "expert" "in the particular field" as is required by the *Mack/Frye* standard. We do not need to decide that issue, however, because the "widely shared" view of all the experts who testified was that electrophoretic testing of dried aged bloodstains was reliable as long as certain standards were met and controls applied.

Their consensus accords with the holdings of most other jurisdictions that have considered the issue. *See, e.g., People v. Reilly,* 196 Cal.App.3d 1127, 1131, 242 Cal. Rptr. 496, 498 (1987) (holding that electrophoretic testing of dried bloodstains met *Frye* standard and technique was properly used in case); Annotation, *Admissibility, in Criminal Cases, of Evidence of Electrophoresis of Dried Evidentiary Bloodstains,* 66 A.L.R.4th 588, 593–601 (1988) (eleven of twelve jurisdictions addressing

the issue of admissibility of electrophoresis test results held it admissible).

Defendant relies not so much on the record made at the mid-trial *Frye* hearing, as on *People v. Young,* 425 Mich. 470, 391 N.W.2d 270 (Mich.1986), the only jurisdiction to find electrophoresis test results inadmissible. The *Young* decision is flawed from the Minnesota perspective because of the court's requirement that witnesses qualified to testify as members of the relevant scientific community must be " 'disinterested and impartial' " experts whose " 'livelihood [is] not intimately connected with the new technique.' " *Id.,* 425 Mich. at 481, 483, 391 N.W.2d at 274, 276 (quoting *People v. Tobey,* 401 Mich. 141, 147, 145, 257 N.W.2d 537, 539 (1977); *People v. Barbara,* 400 Mich. 352, 358, 255 N.W.2d 171, 180 (1977). As a result of this requirement, the *Young* court did not consider testimony by three prosecution witnesses it classified as "technicians," but did consider testimony by three geneticists unfamiliar with electrophoresis of evidentiary bloodstains. *Young,* 425 Mich. at 481, 485, 391 N.W.2d at 274, 276–77. Minnesota's interpretation of *Frye* requires "experts in its field" and has no such narrow requirement of disinterestedness.

The opinion is also unpersuasive because it is a 3–2 decision, with two justices not participating in the decision. The strong dissent disagreed with the narrowness of the rule requiring disinterested and impartial experts and with the interpretation of earlier Michigan precedent as requiring disinterested *scientists. Id.* 425 Mich. at 511–12, 391 N.W.2d at 289 (J. Boyle dissenting with J. Riley concurring in dissent).

Finally, the majority opinion in *Young* relies heavily on the testimony of Dr. Grunbaum. Yet "Dr. Grunbaum is the first and only expert actually involved with electrophoretic typing of bloodstains to attack its reliability." Note, *The Admissibility of Electrophoretic Methods of Genetic Marker Bloodstain Typing Under the* Frye *Standard,* 11 Okla. City U.L.Rev. 773, 791 (1986). As the court in *Reilly* pointed out, the thrust of Dr. Grunbaum's opposition to the reliability of electrophoretic typing of evidentiary bloodstains is concern with the effects of aging, improper preservation and crime scene contaminates on the results of the tests. *Reilly,* 196 Cal.App.3d at 1141, 242 Cal.Rptr. at 505. These concerns have been met. Case law explains that the overall testing procedure rendering electrophoresis reliable already deals with the problem of aging and contamination through the use of proper procedures by well-trained analysts who are aware of the published literature warning of typing problems. *See, e.g., Id.* The record here echoes other case law.

*Testing in Fenney*

█ In the case before us, only the protein PGM differentiated Armendariz's blood from Fenney's. The PGM protein that was consistent with Armendariz's blood was found on all three items of Fenney's clothing that had been in his backpack: a sock, shirt and blue jeans.

At least 76 different enzymes detectable by electrophoresis have been cataloged. Note at 784 n. 66. The BCA tests for only six common types that are considered reliable and important enough in the differentiation of blood samples. The BCA used the single testing process called "isoelectric focusing" on PGM, which eliminated the problem encountered in multi-system testing where the dye filter paper absorbs PGM molecules.

Both witnesses called for the mid-trial *Frye* hearing testified extensively on the control protocols used by the BCA and followed in this instance. Mr. Ronald Enzenauer, who examined the samples in question here, had been working with serological electrophoresis for five years. He underwent one year of training before being authorized to read electrophoresis slides. He has examined "hundreds, if not thousands" of samples and has testified as to electrophoretic test results in approximately 30 cases in Minnesota. His readings were controlled by a second reading, as required by protocol. His training, in combination with the type of test used and the controls requiring second readings, assured accurate, reliable results.

Considering the evidence of reliability and accuracy presented by expert testimony, the extent of the shared belief of the experts in that reliability, and taking note of decisions in other jurisdictions, we hold that electrophoretic typing of aged, dried blood samples as performed by competent analysts using sufficient controls are admissible under the *Mack/Frye* standard.

■ 2. Defendant also alleges that evidence submitted at trial was insufficient to support the jury verdict. The evidence of guilt included evidence of (1) unexplained blood stains consistent with Armendariz's blood but inconsistent with Fenney's, (2) Fenney's footprint in blood on the floor of the Armendariz trailer, (3) his fingerprints on beer cans found at the scene, (4) the condition of Armendariz's body when found, (5) Fenney's activities that night, and (6) inconsistencies in Fenney's own testimony. Viewing the evidence in the light most favorable to the prosecution and assuming the jury believed the state's witnesses and disbelieved any contrary evidence, we hold that the evidence was sufficient.

■ 3. Defendant raises as a third point of error that the trial court violated his due process rights by admitting identification testimony based on an impermissibly suggestive one-person photograph of Fenney shown to one of the witnesses. A threshold question, however, is whether the defense properly preserved this issue for appellate review. Pursuant to Minn.R. Evid. 103(a)(1), "Error may not be predicated upon a ruling which admits * * * evidence unless * * * a timely objection or motion to strike appears of record * * *." For an objection to admission of testimony based on a one-man photographic identification to be "timely," it must be made as soon as the grounds for it appear. *State v. Senske*, 291 Minn. 228, 231, 190 N.W.2d 658, 661 (1971). Otherwise, "[it] is deemed waived since it is impossible for the trial court subsequently to erase from the jury's memory the effect of the testimony." *Id.* Consequently, the claim of error was not preserved for appeal.

■ Nevertheless, where the error is an error in "fundamental law" or "plain error affecting substantial rights", we are free to consider an improperly preserved claim on appeal. *State v. Malaski*, 330 N.W.2d 447, 451 (Minn.1983) (quoting in part Minn. R.Evid. 103(d)).

■ Under the standard set forth in *State v. Marhoun*, 323 N.W.2d 729, 733 (Minn.1982), we hold that in this case there was no likelihood of irreparable misidentification. The witness had seen Fenney with his blue backpack in the trailer park at 5:00 p.m. the day before the murder. She described him to authorities on the following day. Upon being shown a one-person photograph of him, she recognized him as the person she had seen the previous day. Testimony reflected no doubt that Fenney was the person she had seen. Only a one day delay occurred between seeing Fenney in person and in the photograph. As we stated in *Marhoun*, it is "proper for police to take a picture of a person whom they strongly suspect of having committed a crime and show it to people who might have seen the person in the area of the crime * * *." *Marhoun*, 323 N.W.2d at 733.

■ 4. Defendant also assigns as reversible error opinion testimony as to Fenney's demeanor upon being told he was accused of murder and evidence mentioning the work of polygraph testing. It has long been the rule that the results of polygraph tests as well as any direct or indirect references to the taking of or refusal to take such a test are inadmissible. *State v. Kolander*, 236 Minn. 209, 220–22, 52 N.W.2d 458, 464–66 (1952); *State v. Perry*, 274 Minn. 1, 12–13, 142 N.W.2d 573, 580 (1966).

■ In the instant case, reference to polygraph testing occurred in the context of laying a foundation for opinion testimony as to Fenney's reaction to being accused of murder. Both the polygraph testimony and demeanor testimony were wrongly admitted. Testimony that the defendant's reaction upon being charged with murder was "very unusual" and that he did not respond with "emphatic denial" had no real

probative value and the potential for unfair prejudice was high, particularly in light of the impermissible bolstering of Agent Luttring's testimony by reference to his experience administering polygraph tests. *See* Minn.R.Evid. 403; *cf. State v. Fader,* 358 N.W.2d 42 (Minn.1984). Although wrongly admitted, under the facts of this case the error was not reversible error.

 5. Error is also asserted because the trial court did not permit the defense, whose theory of the case was that someone other than defendant had committed the murder, to cross-examine Steven Sack regarding knife threats made toward people other than the victim. This court has permitted the admission of evidence tending to prove another's guilt in a murder case where the issue is whether the defendant did in fact commit the murder, but a proper foundation must first be laid. *State v. Hawkins,* 260 N.W.2d 150, 158–59 (Minn. 1977).

Where the desired cross-examination did not relate to incriminating acts by Sack against the victim and the only conceivable, rational foundation connecting the witness to the crime was his presence in the trailer court that night and his possession of a knife which was too large to have been the weapon used in the murder, the defense failed to provide the necessary foundation. The trial court did not err in refusing to permit the cross-examination regarding knife threats.

 6. Finally, defendant claims the trial court erred in denying a new trial based on newly discovered evidence. This court reviews an appeal of a post conviction denial of a new trial under the abuse of discretion standard, examining the evidence in light of the test set out in *Race v. State,* 417 N.W.2d 264, 266 (1987) and noting that the burden is on the defendant to establish the facts by a preponderance of the evidence as required by Minn.Stat. 590.04, subd. 3 (1988).

 Examining the evidence as a whole, the defense did not meet the test. True, three items of new evidence were presented: (1) hearsay testimony that Josh-ua, Armendariz's son, told his child therapist in February 1988, that another woman had been in the Armendariz trailer the night of the murder, (2) testimony by Wade Abraham that a year after the murder a woman had told him she had been in the Armendariz trailer the night of the murder and that she and named others had committed the murder, and (3) testimony by a witness who had picked Fenney up hitch-hiking at 9:30 a.m. the morning of the murder that Fenney spoke of the murder to him at that time which was prior to discovery of the body.

A reading of the transcript, however, confirms that the first two items were doubtful. Expert testimony revealed that Joshua's testimony was unreliable and contaminated. Wade Abraham's testimony was tainted by bias, his own doubts about its validity, and lack of corroboration. The third item supported the verdict against Fenney by showing that he knew of the murder even before the body was discovered by the authorities. The defense did not meet its burden that the evidence would probably produce an acquittal or a verdict more favorable to defendant. Thus, the trial court did not abuse its discretion in denying a new trial.

Affirmed.